ROBERT E. OPERA -- State Bar No. 101182
ropera@winthropcouchot.com
ANDREW LEVIN – State Bar No. 290209
alevin@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone:  (949) 720-4100
Facsimile:    (949) 720-4111

[Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SANTA ANA DIVISION

| | |
|---|---|
| In re:<br><br>BRAND AFFINITY TECHNOLOGIES, INC., a Delaware corporation,<br><br>        Debtor and<br>        Debtor-in-Possession. | Case No. 8:14-bk-17244 SC<br><br>Chapter 11 Proceeding<br><br>**DECLARATION OF MYDUNG TRAN IN SUPPORT OF DEBTOR'S MOTION FOR ORDER: (1) APPROVING SALE AND BIDDING PROCEDURES IN CONNECTION WITH THE SALE OF ASSETS OF THE DEBTOR'S ESTATE FREE AND CLEAR OF LIENS AND INTERESTS; (2) SETTING A HEARING ON SALE MOTION; AND (3) APPROVING FORM AND MANNER OF NOTICE TO BE PROVIDED TO CREDITORS AND PARTIES-IN-INTEREST IN CONNECTION WITH SALE MOTION**<br><br>DATE:     [Hearing To Be Scheduled]<br>TIME:     [Hearing To Be Scheduled]<br>PLACE:   Courtroom 5C<br>            Ronald Reagan Federal Building<br>            and United States Courthouse<br>            411 West 4th Street<br>            Santa Ana, CA 92701 |

I, Mydung Tran, hereby declare and state as follows:

1.     I am the Chief Financial Officer and President of Debtor Brand Affinity Technologies, Inc. ("Debtor"). The matters set forth herein are within my own personal knowledge, and, if called upon as a witness, I could and would competently testify thereto.

2.     This Declaration is provided in support of the Debtor's Motion for Order: (1) Approving Sale and Bidding Procedures in Connection with the Sale of Assets of the Debtor's Estate Free and Clear of Liens and Interests; (2) Setting a Hearing on Sale Motion; and (3) Approving Form and Manner of Notice to Be Provided to Creditors and Parties-in-Interest in Connection with Sale Motion ("Sale Procedures Motion").[1]

3.     I have served as the Chief Financial Officer of the Debtor since October 16, 2010. As Chief Financial Officer of the Debtor, I am responsible for overseeing and managing all aspects of the Debtor's financial affairs, including overseeing the preparation and maintenance of all financial reporting by the Debtor. I will be responsible for all financial reporting in connection with the Debtor's Chapter 11 case, and I will be primarily responsible for overseeing the administration of the Debtor's Chapter 11 case and for interfacing with the Debtor's counsel with respect to proceedings in the Debtor's case.

4.     In connection with my performing my duties as Chief Financial Officer of the Debtor, I have acquired substantial knowledge of all material aspects of the Debtor's financial affairs, including the Debtor's financial reporting.

**The Debtor and the Debtor's Financial Affairs.**

5.     The Debtor is a corporation organized under the laws of the State of Delaware. The Debtor's headquarters is located in Irvine, California. The Debtor is engaged in the business of providing services and a platform for image capturing (e.g., photography), image e-commerce, and digital content aggregation, management, sharing and distribution.

6.     The Debtor's business has been, and continues to be, unprofitable. The Debtor's financial performance since 2012 is summarized as follows:

---

[1] Capitalized terms not otherwise defined herein shall have the same definitions ascribed to them in the Sale Procedures Motion.

| Year | Revenues | Operating Profitability (Losses) |
|------|----------|----------------------------------|
| 2012 | $11,146,236 | $(6,724,008) |
| 2013 | $15,210,566 | $(9,090,473) |
| 2014 (Jan. 1, 2014– Oct. 31, 2014) | $9,608,020 | $(2,962,075) |

7.       The Debtor's business is deteriorating and the Debtor is experiencing severe financial difficulties.  The Debtor's financial difficulties are attributable primarily to the following: reduced revenues and conversion rates as consumers have moved towards mobile use and consumption of photos; increased labor costs to capture photos; increased licensing fees for branded marks used in the sale of photo products, charged by National Football League teams, Major League Baseball teams and by other entities; increased constraints placed by trading partners on marketing activities; increased overhead costs to support proposed growth initiatives; the substantial legal fees incurred by the Debtor to defend a pending class action lawsuit filed against the Debtor in June 2013 (Yahchaaroah Lightbourne v. Printroom, Inc., Professional Photo Storefronts, Inc., Brand Affinity Technologies, Inc., and CBS Interactive, Inc.) ("Lightbourne Action"); and the uncertainty and disruption associated with the Lightbourne Action and the counter-claims asserted against the Debtor by CBS Interactive, Inc. in connection therewith, particularly with respect to capital raising activities for the Debtor.  These financial difficulties caused cash flow problems for the Debtor, and, as a consequence, the Debtor failed to pay timely numerous creditors.  The Debtor acted diligently to reduce its operating expenses and to restructure its obligations with its creditors in order to attempt to achieve positive cash flow, but these efforts ultimately were not successful.  Moreover, given the Debtor's financial difficulties and the pendency of the Lightbourne Action, the Debtor has been unable to obtain financing or equity infusions in an amount adequate to sustain the Debtor's ongoing operations.

8.       As of the Petition Date, the Debtor had approximately $11,000 in cash.  The Debtor projects that, for the first 60 days after the Petition Date, the Debtor's operations will be unprofitable, and that the Debtor will need an approximately $75,000 cash infusion in order for the

MAINDOCS-#208134-v2-BAT_TranDecReSaleMtn.doc

1   Debtor to be able to sustain its operations during such time period.  The Debtor has obtained from

2   the proposed Stalking Horse Bidder a commitment to provide such cash infusion, in the form of a

3   secured loan as an advance against the Purchase Price to be paid by it.  A copy of a projection,

4   showing the Debtor's projected cash receipts and disbursements for the first 60 days after the

5   Petition Date, is attached hereto as Exhibit "1" and is incorporated herein by this reference ("Cash

6   Flow Projection").  I was primarily responsible for preparing the Cash Flow Projection.  I believe

7   that the material assumptions underlying the Cash Flow Projection are reasonable, and that, subject

8   to the occurrence of any unforeseen events, the Cash Flow Projection should be a reasonably

9   accurate projection of the Debtor's cash flow for the time period indicated.

10          9.       The Debtor believes that it is unlikely that it will be able to stem its operating

11  losses.  As indicated in the Cash Flow Projection, the Debtor projects that, for the first 60 days

12  after the Petition Date, the Debtor's cash flow will not be sufficient to pay its accruing obligations.

13  The Debtor has concerns, therefore, regarding the viability of its business.

14          **Sale of Substantially All of the Debtor's Assets.**

15          10.      Given the concerns regarding the viability of the Debtor's business, the Debtor has

16  determined that the best means for maximizing the value of the Debtor's assets is to attempt to sell

17  as expeditiously as possible the Debtor's business as a going concern.  Toward that end, the Debtor

18  has received from the Stalking Horse Bidder an offer to purchase substantially all of the Debtor's

19  assets for a purchase price equal to the sum of the following:  (i) $400,000 cash; (ii) the

20  assumption of the Assumed Liabilities; and (iii) the payment of Sales Taxes and Cure Costs

21  associated with the Transaction.  This offer currently represents the only and thus highest and best

22  offer that the Debtor has received for its assets.  A true and correct copy of the Purchase

23  Agreement reflecting this offer, in substantially final form, is attached hereto as Exhibit "2" and is

24  incorporated herein by this reference.

25          11.      Given the Debtor's financial difficulties and unpaid debt, the Stalking Horse Bidder

26  requires that the Transaction be consummated pursuant to a sale process in Chapter 11.

27          12.      In order to preserve the value of the Debtor's assets for the benefit of the Debtor's

28  creditors, the Debtor intends to pursue in this case, subject to the approval of the Court, a sale to

MAINDOCS-#208134-v2-BAT_TranDecReSaleMtn.doc

1  the Stalking Horse Bidder of substantially all of the Debtor's assets pursuant to the terms and

2  conditions of the Purchase Agreement, subject to an open and competitive bidding process.

3       13.    Given the Debtor's cash flow difficulties, the Debtor does not have the financial

4  wherewithal to continue to operate its business throughout a prolonged Chapter 11 process.  I

5  believe that, unless a sale of the Debtor's assets is expeditiously consummated, there will be

6  significant deterioration in the value of the Debtor's assets.  The Debtor cannot endure an extended

7  stay in Chapter 11 without significant risk to the Debtor's survival.

8       14.    Subject to the approval of the Court, the Debtor has employed GlassRatner to

9  provide consulting and marketing services to assist the Debtor with respect to the sale process.

10  GlassRatner's services for the Debtor will include the following:

11       a.    Preparing an information memorandum for distribution to prospective

12  bidders ("Sale Information Memorandum");

13       b.    Developing a list of prospective bidders;

14       c.    Assisting the Debtor regarding the marketing of the Debtor's assets;

15       d.    Assisting bidders to perform diligence investigations with respect to the

16  Debtor's business, including assisting with respect to the development and management of

17  a data room;

18       e.    Attempting to obtain overbids for the Debtor's assets and engaging in

19  negotiations with bidders to try to maximize proceeds from the sale of the Debtor's assets;

20  and

21       f.    Assisting the Debtor in its efforts to obtain from the Court approval of a

22  Transaction, and assisting with respect to the Closing of a Transaction.

23  **Sale and Bidding Procedures.**

24       15.    The sale of the Purchased Assets is subject to the sale and bidding procedures

25  proposed by the Debtor pursuant to the Sale Procedures Motion, and, ultimately, to this Court's

26  approval.  The Debtor believes that a going concern sale of the Purchased Assets will maximize

27  the value of its estate for the benefit of its creditors and is therefore preferable to any effort to

28  dispose of the Purchased Assets on a piecemeal basis through a liquidation.

16.     In order to create a fair, orderly and competitive process for the bidding on the Purchased Assets, the Debtor proposes that the Court approve the sale and bidding procedures with respect to the contemplated sale of the Purchased Assets in substantially the form reflected in the Sale Procedures Memorandum (Exhibit "2" to the Krisher Declaration).

17.     I believe that the proposed sale and bidding procedures are reasonable, provide for a level playing field for all prospective bidders and for "transparency" in the sale process in this case, and will facilitate an orderly and fair sale process.

**Sale Procedures Motion Hearing.**

18.     I believe that the Sale Procedures Motion should be heard on as prompt a basis as possible for, in part, the following reasons:

a.     The Debtor needs to close the sale of the Purchased Assets by February 17, 2015 in order to comply with the terms of the Purchase Agreement.

b.     The Debtor lacks adequate cash to operate its business and that, absent a cash advance from the Stalking Horse Bidder, the Debtor would run out of cash by about mid-January 2015. A termination of the Debtor's business operations would have an extremely adverse impact on the value of the Debtor's estate. The value of the Debtor's assets would deteriorate substantially in a Chapter 7 liquidation, the likely consequence of any inability by the Debtor to fund the Debtor's ongoing operations. In order to preserve the going concern value of the Debtor's assets, then, the sale process must be effectuated as expeditiously as possible.

c.     The Debtor intends to market diligently the Purchased Assets. It is important for prospective bidders participating in the sale process to obtain, as promptly as possible, notice of the sale and bidding procedures approved by the Court.

d.     I believe that no prejudice will be caused to any creditor or other party-in-interest if the Court considers promptly the Sale Procedures Motion. In my judgment, the sale and bidding procedures proposed by the Debtor are fair and provide for a level playing field for all prospective bidders.

MAINDOCS-#208134-v2-BAT_TranDecReSaleMtn.doc

1    19.    The Debtor's proposed timeline for the sale process in this case is attached hereto as

2  Exhibit "3" and is incorporated herein by this reference.

3    **Sale Motion Hearing.**

4    20.    I believe that the hearing on the Sale Motion ("Sale Motion Hearing") should be

5  held on or as soon as practicable after February 2, 2015.

6    21.    The Purchase Agreement provides that the Closing of the Transaction must occur

7  by February 17, 2015. Conducting the Sale Motion Hearing on or about February 2, 2015 will

8  provide to the Debtor time adequate to obtain Court approval of a Transaction and to close the

9  Transaction.

10    22.    Given the Debtor's limited cash resources, it is important that the sale process be

11  conducted as promptly as possible. The Debtor projects that it would run out of cash by about

12  mid-January 2015, absent a cash advance from the Stalking Horse Bidder. Conducting the Sale

13  Motion Hearing on or about February 2, 2015 will allow the Debtor to close a Transaction by

14  February 17, 2015, thereby preserving the going-concern value of the Debtor's business.

15    23.    Setting the Sale Motion Hearing for about February 2, 2015 will allow the Debtor

16  to give to creditors and parties-in-interest, and any prospective bidders for the Purchased Assets,

17  ample notice of the Sale Motion Hearing.

18    **Notice of Sale Proceedings.**

19    24.    The Debtor, with the assistance of GlassRatner, is in the process of marketing the

20  Debtor's assets. The Debtor's marketing efforts will include the following:

21    a.    Advertising. The Debtor will advertise the proposed sale for approximately

22    one month in the digital editions of the Los Angeles Times and the Silicon Valley Business

23    Journal. Moreover, notice of the sale will be posted on websites that specifically feature

24    assets offered for sale through Bankruptcy Code Section 363 proceedings.

25    b.    Contacting of Potential Bidders. GlassRatner, with input from the Debtor, is

26    in the process of developing a list of parties, such as competitors of the Debtor, that

27    potentially may have interest in acquiring assets of the Debtor. GlassRatner will provide to

28    such parties, among other things, copies of the following documents:  the Sale Motion

MAINDOCS-#208134-v2-BAT_TranDecReSaleMtn.doc

1   Hearing Notice; the Sale Information Memorandum; and the Sale Procedures

2   Memorandum.  GlassRatner will supplement such list by providing notice of the sale

3   process to numerous investment banking firms and to other potential financial and strategic

4   acquirers.

5         c.     Sale Motion Hearing Notice.  The Debtor will serve a copy of the Sale

6   Motion Hearing Notice on all of the Debtor's creditors and other parties-in-interest in this

7   case.

8        25.     A copy of the proposed advertisement of the sale of the Debtor's assets is attached

9   hereto as Exhibit "4" and is incorporated herein by this reference.  I believe that the advertisement

10  sets forth clearly material information regarding the sale process in this case.

11       26.     The Debtor estimates that the cost of such advertisements will be approximately

12  $3,500.  It is my judgment that the Debtor cannot afford to incur materially additional expense in

13  connection with the advertising of the sale process.

14       27.     Attached as Exhibit "5" hereto and incorporated herein by this reference is the

15  Debtor's proposed Sale Motion Hearing Notice to be served on creditors and parties-in-interest in

16  connection with the Sale Motion Hearing.  I believe that the Sale Motion Hearing Notice sets forth

17  clearly the sale and bidding procedures proposed by the Debtor, the date and time of the Auction,

18  the date and time of the Sale Motion Hearing, the date by which any objections to the Sale Motion

19  must be filed, and all other material information relevant to the sale process.

20       28.     The Debtor will serve the Sale Motion Hearing Notice on the following entities:

21  (i) all creditors of the estate and parties-in-interest in this case; (ii) all entities who have requested

22  special notice in this case; and (iii) entities that have expressed interest, or that the Debtor believes

23  may have legitimate interest, in acquiring the Purchased Assets (e.g., competitors of the Debtor,

24  mergers and acquisitions firms, investment banking firms, and other potential financial or strategic

25  acquirers), a list of which is being developed by GlassRatner with input from the Debtors.

26       29.     The Debtor will serve a copy of the Sale Motion on the following entities:  (i) the

27  United States Trustee; (ii) any official committee of creditors that may be formed in the Debtor's

28  case or any counsel employed thereby; and (iii) those parties whose unexpired leases or executory

1 | contracts are proposed to be assumed and assigned, or rejected, in connection with the Transaction.

2 | All other creditors and parties-in-interest will receive a copy of the Sale Motion Hearing Notice.

3 |      30.    I believe that the notice proposed by the Debtor will help to ensure that the sale of

4 | the Purchased Assets will receive as much exposure as reasonably possible under the

5 | circumstances of this case, particularly given the Debtor's financial distress, and will help to

6 | ensure a level playing field in the sale process. I believe that the proposed notice to be provided to

7 | creditors and parties-in-interest (including, without limitation, the entities most likely to submit

8 | bids for the purchase of the Purchased Assets) is well designed to attract interest in the acquisition

9 | of the Purchased Assets, and thereby to maximize the value of the Purchased Assets.

10 | **Disclosure Regarding Affiliation of Stalking Horse Bidder.**

11 |      31.    It is my understanding that the Stalking Horse Bidder is a California limited

12 | liability company, 100% of the membership interests in which is owned by Ryan Steelberg.

13 | Mr. Steelberg is a founder of the Debtor, and, until he resigned on December 15, 2014, was Chief

14 | Executive Officer and President of the Debtor. Mr. Steelberg continues to serve as a member of

15 | the Board of Directors of the Debtor.

16 |      32.    Given Mr. Steelberg's involvement with the Stalking Horse Bidder, Mr. Steelberg

17 | will have no role of any nature for the Debtor in the sale process. Mr. Steelberg will recuse

18 | himself from any evaluation by the Debtor of issues pertaining to, or any participation on behalf of

19 | the Debtor in, the sale process.

20 |      33.    Cognizant of the fact that the Stalking Horse Bidder is an entity affiliated with the

21 | Debtor, the Debtor has employed GlassRatner to be primarily responsible for conducting the sale

22 | process in this case. GlassRatner will be charged with the primary responsibility for handling, on

23 | behalf of the Debtor, all matters relating to the sale process, including the marketing of the

24 | Debtor's assets, the coordinating of diligence by prospective bidders, the negotiations with

25 | prospective bidders, the evaluation of any overbids, and the closing of any Transaction. I believe

26 | that the employment of GlassRatner to handle the sale process in this case will help to ensure that

27 | the sale process will be conducted fairly and in an open and transparent manner, with no bias in

28 | favor of the Stalking Horse Bidder. GlassRatner is charged with the responsibility of conducting a

1  fair and open sale process and attempting to maximize the recovery from the sale of the Debtor's

2  assets.  GlassRatner will owe its duty and loyalty in this case solely to the Debtor's estate, and not

3  to the Debtor's insiders or to the Stalking Horse Bidder.

4      I declare under penalty of perjury that the foregoing is true and correct.

5      Executed this 16th day of December 2014 at Irvine, California.

6

7

8      Mydung Tran

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

.

Exhibit "1"

| Semi- Month Ending | | | 12/31/2014 | | 1/15/2015 | | 1/31/2015 | | 2/15/2015 |
|---|---|---|---|---|---|---|---|---|---|
| **Cash Receipts** | | | | | | | | | |
| Sales | | $ | 154,440 | $ | 48,600 | $ | 48,600 | $ | 48,600 |
| A/R | | $ | 115,129 | | | $ | 171,000 | | |
| Advance From SH Bidder | | | | $ | - | $ | 75,000 | $ | - |
| **Total** | | $ | 269,569 | $ | 48,600 | $ | 294,600 | $ | 48,600 |
| | | | | | | | | | |
| **Operating Expenses** | | | | | | | | | |
| COGS/Sales Tax | | $ | 99,068 | $ | 49,583 | $ | 164,393 | $ | 38,943 |
| Salaries | | $ | 22,750 | $ | 41,648 | $ | 32,199 | $ | 32,199 |
| Professional Fees/Consultants | | | | | | | | | |
| Database | | $ | 2,700 | | | $ | 2,700 | | |
| IT Support | | | | $ | 6,500 | | | $ | 6,500 |
| Contractors | | $ | 2,000 | $ | 2,000 | $ | 2,000 | $ | 2,000 |
| Legal/Financial | | | | | | | | | |
| Winthrop Couchot | | $ | - | $ | 50,000 | $ | - | $ | - |
| GlassRatner | | $ | - | $ | - | $ | - | $ | - |
| Marketing | | $ | - | $ | 3,500 | $ | - | $ | - |
| Insurance | | $ | - | $ | 12,616 | $ | - | $ | 12,616 |
| Rent | | $ | - | $ | 14,200 | $ | - | $ | 14,200 |
| Utilities & Connectivity | | $ | 2,500 | $ | 3,300 | $ | 2,500 | $ | 3,300 |
| IT Opex | | | | | | | | | |
| Hosting | | $ | 5,600 | $ | - | $ | 16,283 | $ | - |
| Monitoring | | | | $ | 3,570 | | | $ | 570 |
| Other | | $ | 1,000 | $ | 1,000 | $ | 1,000 | $ | 1,000 |
| Other SG&A | | $ | 2,500 | $ | 2,500 | $ | 2,500 | $ | 2,500 |
| **Total Disbursements** | | $ | 138,118 | $ | 190,417 | $ | 223,575 | $ | 113,828 |
| **Cashflow** | | $ | 131,452 | $ | (141,817) | $ | 71,025 | $ | (65,228) |
| **Cash balance** | $ | 11,000 | $ | 142,452 | $ | 635 | $ | 71,660 | $ | 6,432 |

| **Clearance Amex** | Total | | Billed/Paid | | 1/31/2015 Remaining | |
|---|---|---|---|---|---|---|
| Revenue | $ | 195,000 | $ | 25,000 | $ | 170,000 |
| Talent Fees | $ | 160,000 | $ | 23,750 | $ | 136,250 |

| | 12/31/2014 | 1/15/2015 | 1/31/2015 | 2/15/2015 |
|---|---|---|---|---|
| **Fanphotos** | | | | |
| Tour | | | | |
|   Onsite Revenue | $ 98,000 | $ 30,000 | $ 30,000 | $ 30,000 |
|   Taxes | $ 7,840 | $ 2,400 | $ 2,400 | $ 2,400 |
| | | | | |
| Online | $ 45,000 | $ 15,000 | $ 15,000 | $ 15,000 |
|   Taxes | $ 3,600 | $ 1,200 | $ 1,200 | $ 1,200 |
| | | | | |
|   Total Receipts | $ 154,440 | $ 48,600 | $ 48,600 | $ 48,600 |
| | | | | |
| COGS | | | | |
|   Labor | $ 14,310 | $ 4,536 | $ 4,536 | $ 4,536 |
|   Product (onsite) | $ 24,325 | $ 5,250 | $ 5,250 | $ 5,250 |
|   Product (online) | $ 9,000 | $ 3,000 | $ 3,000 | $ 3,000 |
| | | | | |
|   Rev Share | | | | |
|     Tour | $ 35,683 | $ 10,107 | $ 10,107 | $ 10,107 |
|     Online | $ 15,750 | $ 5,250 | $ 5,250 | $ 5,250 |
| | | | | |
|   Taxes | $ 11,440 | $ 3,600 | $ 3,600 | $ 3,600 |
| | | | | |
|   Total Cogs | $ 110,508 | $ 31,743 | $ 31,743 | $ 31,743 |
| | | | | |
| Gross Profit | $ 43,933 | $ 16,857 | $ 16,857 | $ 16,857 |
| *Gross Profit %* | *30.7%* | *37.5%* | *37.5%* | *37.5%* |

| | Annual | Monthly | Taxes | Benefits | Total |
|---|---|---|---|---|---|
| Mydung Tran | $ 209,000 | $ 17,417 | $ 1,480 | $ - | $ 18,897 |
| Monica Sickle | $ 55,000 | $ 4,583 | $ 390 | $ 525 | $ 5,498 |
| Patrick Depalma | $ 61,000 | $ 5,083 | $ 432 | $ 525 | $ 6,040 |
| Mary Orozco | $ 38,000 | $ 3,167 | $ 269 | $ 525 | $ 3,961 |
| Allen, James | $ 135,000 | $ 11,250 | $ 956 | $ 525 | $ 12,731 |
| Kapul, Michael | $ - | $ - | $ - | | |
| Lee, Adelyn | $ 53,000 | $ 4,417 | $ 375 | $ 525 | $ 5,317 |
| Makarchuk, Sarah | $ 35,235 | $ 2,936 | $ 250 | $ 525 | $ 3,711 |
| Venkat, Girish | $ 126,000 | $ 10,500 | $ 893 | $ - | $ 11,393 |
| | | $ 59,353 | $ 5,045 | $ 3,150 | $ 67,548 |

## Key Assumptions

| | |
|---|---|
| Revenue | - Fanphotos:Trophy Tour and SF Giants storefront sales only; assume only 3 per semi-month at $10K per event |
| | - Clearance: $0 |
| A/R Receipts | - Receive $91K from affiliated company A/R; receive $24K return of security deposit from BOE |
| COGS | - includes variable labor, product and revenue share |
| Salaries | - Assume retention of existing employees except for 1 employee whose last day is 12/16/14 |
| Marketing | - budget for marketing sale process |
| Insurance | - payment of 2 remaining monthly payments for Gen'l, WC, Property & Umbrella; payment of E&O on installment |
| | - employer portion of health insurance premium |
| Rent | - Assume terminating of 101 Academy Way lease as of 12/31/14 and relocation to smaller space for $3K per month |

Exhibit "2"

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is made, and executed and entered into as of December 16, 2014 (the "**Execution Date**"), by and between Brand Affinity Technologies, Inc. ("**Seller**") and Creekside Investment Management, LLC ("**Buyer**") (each a "**Party**" and, collectively, the "**Parties**"). Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Appendix attached hereto (which appendix is incorporated herein by this reference).

### RECITALS

A.      On December 15, 2014 (the "**Petition Date**"), Seller filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Seller's case is currently pending before the United States Bankruptcy Court for the Central District of California, Santa Ana Division (the "**Bankruptcy Court**") as Case No. 8:14-bk-17244 SC (the "**Bankruptcy Case**").

B.      Seller is engaged in the business of providing services and a platform for image capturing (e.g., photography), image e-commerce, and digital content aggregation, management, sharing and distribution ("**Business**").

C.      Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of Seller's right, title and interest in and to the assets described in Section 1.1 of this Agreement (the "**Transaction**"). The Transaction is subject to approval by the Bankruptcy Court.

**NOW, THEREFORE**, based upon the foregoing Recitals, and in consideration of the mutual promises, covenants, and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the

Parties, and subject to the terms and conditions of this Agreement, the Parties, intending to be legally bound, hereby agree as follows:

## AGREEMENT

## ARTICLE I.

## PURCHASE AND SALE OF ASSETS

**1.1** **Purchase and Sale of Assets and Properties**.  Subject to the terms and conditions of this Agreement, including, without limitation, approval of the Bankruptcy Court, Seller shall sell, transfer, assign, convey and deliver to Buyer, free and clear of Liens other than Permitted Liens, pursuant to section 363(f) of the Bankruptcy Code, and Buyer shall purchase, assume and accept from Seller, all of Seller's right, title and interest in and to all of the assets, properties, interests and rights of Seller, wherever located, of whatever kind or nature, tangible or intangible, except only for the Excluded Assets (collectively, the **"Purchased Assets"**).  The Purchased Assets include, but are not limited to, the following:

**1.1.1** **Assumed Contracts.**  All Contracts of Seller, including, without limitation, the Intellectual Property Agreements, listed specifically on Exhibit A hereto (**"Assumed Contracts"**).

**1.1.2** **Furniture, Fixtures and Equipment.**  All furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, computers, servers, telephones, signs, and other items of personal property used in the Business, including, without limitation, the items listed on Exhibit B hereto.

**1.1.3** **Inventory.**  All inventory, supplies, finished goods, and works in progress of Seller.

MAINDOCS-#207396-v5-BrandAffinity-Asset_Purchase_Agreement.docx

**1.1.4    Permits.** All permits, licenses, authorizations, registrations, consents and approvals relating to the Business, whether governmental or otherwise, solely to the extent that they are not Nonassignable Assets.

**1.1.5    Telephone Numbers.** All telephone numbers, facsimile numbers and e-mail addresses for the Business, solely to the extent that they are not Nonassignable Assets.

**1.1.6    Owned IP.** All Owned IP, and all right, title and interest therein, and all right to bring Actions and collect damages and enforce other remedies against third parties for past, present or future Infringement or other violation of the Owned IP.

**1.1.7    Warranty Claims Relating to Purchased Assets.** All claims and rights under warranties and indemnities and all similar rights against third parties, to the extent relating to or attributable to a Purchased Asset or an Assumed Liability ("**Warranty Claims**").

**1.1.8    Insurance Claims Relating to Purchased Assets.** All rights, claims, recoveries, payments from or proceeds of insurance policies, to the extent relating to or attributable to a Purchased Asset or an Assumed Liability ("**Insurance Claims**").

**1.1.9    Books and Records.** Except as set forth expressly to the contrary in Section 1.2.1 hereof, the Books and Records of Seller.

**1.1.10    Equity Security Interests.** All of Seller's equity securities (as such term is defined in section 101(16) of the Bankruptcy Code) in Veritone, Inc.

**1.1.11    Goodwill.** All goodwill associated with the Purchased Assets.

1.1.12 **Other Assets.** Except for any Excluded Assets, all of Seller's other intangible and tangible property that relate to the Business or that are used or held for use in connection with the Business, including all such assets not heretofore mentioned.

1.2    **Excluded Assets.** Notwithstanding anything to the contrary contained in Section 1.1 hereof or elsewhere in this Agreement, the Purchased Assets do not include, Buyer shall not acquire (nor assume any liability related to), and Seller shall retain all right, title and interest in and to the following assets and properties of Seller (collectively, "**Excluded Assets**"):

1.2.1   **Organizational Documents.** All minute books, seals, stock books, charter documents and other books and records pertaining to the existence, organization or governance of Seller (collectively, "**Organizational Documents**").

1.2.2   **Accounts Receivable.** All of Seller's trade accounts receivable and other rights to payment from customers, licensees, or other third parties to the extent arising out of the operation of the Business ("**Accounts Receivable**").

1.2.3   **Cash.** All cash, cash equivalents, investments, accounts and notes receivable, and funds payable to Seller under pending credit and debit card transactions.

1.2.4   **Refunds and Deposits.** All deposits, including, without limitation, utility or leasehold deposits, rights to refunds, including, without limitation, insurance or tax or assessment refunds, unused retainer payments, rebates, returns and pre-paid expenses and all similar assets or properties of Seller, attributable to or based upon the period through the Closing Date, and any claims for such deposits, refunds, retainer payments, rebates, returns, pre-paid expenses or similar payments.

**1.2.5    Bank Accounts.** All bank accounts and investment accounts maintained by or for Seller.

**1.2.6    Nonassignable Assets.** All governmental permits and governmental licenses, rights, registrations, variances, waivers, consents, authorizations, approvals, contracts or agreements, and all other permits, licenses, rights, variances, registrations, waivers, consents, authorizations, approvals, contracts or agreements, including without limitation, all Intellectual Property Agreements, which either (i) require the consent of any party other than Seller for the transfer or assignment thereof to Buyer, or (ii) the Bankruptcy Court does not authorize Seller to transfer or to assign to Buyer (collectively, **"Nonassignable Assets"**); provided, however, that any Assumed Contract, as identified expressly in Exhibit A hereof, shall not constitute a Nonassignable Asset.

**1.2.7    Warranty Claims Relating to Excluded Assets.** All claims and rights under warranties and indemnities and all similar rights against third parties, to the extent relating to or attributable to any Excluded Asset or Excluded Liability.

**1.2.8    Insurance Claims Relating to Excluded Assets.** All insurance policies of Seller, and all rights, claims, refunds, recoveries, payments from or proceeds of insurance policies, to the extent relating to or attributable to any Excluded Asset or Excluded Liability.

**1.2.9    Claims and Causes of Action.** Except only for any Warranty Claims or Insurance Claims, all claims and causes of action of Seller, whether or not such claims or causes of action are the subject of an Action pending as of the Closing Date, including, without limitation, claims for relief, rights or recovery, rights of set-off, rights of contribution, rights of recoupment, counter-claims, cross-claims and defenses of Seller, Seller's claims against CBS Interactive, Inc., asserted in connection with that action entitled,

"Yahchaaroah Lightbourne v. Printroom, Inc., Professional Photo Storefronts, Inc., Brand

Affinity Technologies, Inc., and CBS Interactive, Inc." ("**Lightbourne Action**"), and all

preference, fraudulent transfer, or other avoidance claims and actions of Seller, including,

without limitation, all such claims and actions arising under sections 510, 544, 545, 547,

548, 549 and/or 550 of the Bankruptcy Code.

      1.2.10  **Contract Not Designated as Assumed Contract.**  Any Contract, including,

without limitation, any Intellectual Property Agreement, not designated as an Assumed

Contract on Exhibit A hereto.

      1.2.11  **Assets Scheduled for Exclusion by Buyer.**  Any asset or property that

otherwise would be a Purchased Asset that Buyer elects specifically not to acquire from

Seller as set forth in Exhibit C hereto.

      1.2.12  **Rights of Seller Under This Agreement.**  All rights of Seller under this

Agreement or any agreement entered into in connection with this Agreement or the

Transaction contemplated hereby.

Buyer shall acquire absolutely no interest in or benefit from any Excluded Assets, all of which shall

remain the sole property of Seller.

      1.3  **Purchase Price.**  The purchase price for the Purchased Assets ("**Purchase Price**")

shall be as follows:

      1.3.1  **Cash.**  Buyer shall pay $400,000 cash for the Purchased Assets.

      1.3.2  **Cure Costs.**  Buyer shall pay any and all costs required to be paid to cure

arrearages under the Assumed Contracts in connection with the assumption and assignment

to Buyer of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code ("**Cure Costs**").

       **1.3.3**   **Sales Taxes**. Buyer shall pay any and all sales or transfer taxes that may be assessed on any of the Purchased Assets in connection with the Closing of the Transaction ("**Sales Taxes**") as and when such Sales Taxes become due.

       **1.3.4**   **Assumed Liabilities**. The Purchase Price shall reflect the Assumed Liabilities, as defined in and as set forth in Article II of this Agreement.

    **1.4**   **Payment of Purchase Price**. In addition to Buyer's assumption of the Assumed Liabilities as set forth by Article II hereof and Buyer's payment of any Sales Taxes as and when any such Sales Taxes become due, Buyer shall pay the Purchase Price to be paid hereunder to Seller as follows:

       **1.4.1**   **Purchase Deposit**. On the first Business Day after the Execution Date of this Agreement, Buyer shall deliver to Seller a cash deposit in the amount of $100,000 ("**Purchase Deposit**"). The Purchase Deposit shall be held in the trust account of Seller's general insolvency counsel, Winthrop Couchot Professional Corporation, pending the Closing of the Transaction and shall be disbursed only in accordance with the terms and conditions of this Agreement, or upon the entry of an order of the Bankruptcy Court authorizing the disposition thereof.

       **1.4.2**   **Closing Date Cash Payment**. At the Closing, the Purchase Deposit shall be disbursed to Seller, and Buyer shall pay, in cash by wire transfer of immediately available funds, to an account designated by Seller the amount of the Cash Consideration, less the amount of the Purchase Deposit ("**Closing Date Cash Payment**").

1.5    **Allocation of Purchase Price.**  On the Closing Date, Buyer shall provide to Seller written notice of Buyer's allocation of the Purchase Price among the Purchased Assets.  Seller shall have the right to approve such allocation of the Purchase Price, which approval shall not be unreasonably withheld by Seller.  Each Party shall report the Transaction for tax purposes and for all other purposes in accordance with such allocation of the Purchase Price.

## ARTICLE II.

## ASSUMPTION OF LIABILITIES

Buyer shall assume and pay, perform and discharge, as and when due, only the following liabilities and obligations of Seller (collectively, "**Assumed Liabilities**"):

2.1    **Liabilities Under Assumed Contracts.**  All liabilities and obligations of Seller becoming due after the Closing Date pursuant to the Assumed Contracts.

2.2    **Permitted Liens.**  All Permitted Liens.

2.3    **Scheduled Liabilities.**  All liabilities and obligations of Seller set forth on Exhibit D hereto.

## ARTICLE III.

## EXCLUDED LIABILITIES

Other than the Assumed Liabilities and Buyer's obligations under Article XV hereof, Buyer shall not assume, pay or perform, nor shall Buyer defend, indemnify or hold harmless Seller, its successors or assigns, from or against, or have any responsibility whatsoever for, any liabilities, debts or obligations of Seller of any nature or description, whether arising in contract, tort or otherwise, whether accrued, absolute, contingent or otherwise, whether asserted before or after the

Closing, including, without limitation, any of the following liabilities all of which shall remain the exclusive responsibility of Seller ("**Excluded Liabilities**"):

**3.1**  **Governmental Liabilities**.  Liabilities of Seller to any Governmental Entity, including, without limitation, for unpaid Taxes of any type or description, or penalties or interest, on account of any Tax, arising by reason of the ownership, use and/or operation of the Purchased Assets prior and up to the Closing, or arising on account of income of Seller.

**3.2**  **Business Liabilities**.  Liabilities of Seller incurred or arising out of events occurring at or prior to the Closing, including but not limited to, liabilities of Seller to Seller's creditors, lienholders, customers, suppliers, employees, independent contractors, employee benefit plans as defined in the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), and trustees of ERISA plans.

**3.3**  **Litigation**.  Liabilities of Seller resulting from any Action pending prior to the Closing or relating to occurrences or events occurring at or before the Closing, including, without limitation, any pending or threatened Action for unpaid liabilities of Seller or regarding Seller's employment practices.

**ARTICLE IV.**

**RISK OF LOSS**

Risk of loss to the Purchased Assets shall not pass to Buyer until the Closing.  In the event that any material destruction or damage of any Purchased Assets associated with the Business occurs prior to the Closing, Seller shall provide promptly to Buyer written notice thereof. Within ten (10) days of Seller's giving to Buyer any such notice, Buyer shall elect, by written notice given to Seller, either: (i)  to terminate this Agreement in which event this Agreement shall be of no

further force or effect, and neither Party shall have any rights against the other Party by reason of this Agreement or such termination of this Agreement; or (ii) to accept any insurance proceeds otherwise payable to Seller to cover the loss associated with the destruction or damage to the Purchased Assets associated with the Business. Seller agrees to support any modification of this Agreement that has been bargained for and agreed to in good faith by Seller and Buyer as a result of any such destruction or damage of Purchased Assets, and, as needed, to promptly seek Bankruptcy Court approval of such modification.

**ARTICLE V.**

**COVENANTS OF SELLER**

Seller hereby covenants and agrees that it will act as follows:

**5.1** **Seller's Reasonable Efforts to Consummate Agreement.** From the Execution Date until the Closing, subject to the terms and conditions of this Agreement, Seller shall use commercially reasonable efforts to take, or cause to be taken, all acts on its part as may be advisable to consummate and to make effective the Transaction.

**5.2** **Consents of Seller**. From the Execution Date until the Closing, Seller shall use commercially reasonable efforts to obtain, or cause to be obtained, all appropriate releases, consents, waivers and approvals as may be advisable to consummate and to make effective the Transaction.

**5.3** **Relationships with Suppliers and Customers**. From the Execution Date until the Closing, Seller shall use commercially reasonable efforts to maintain its current relationships with suppliers, customers and others having business relations with Seller in connection with the

Purchased Assets, subject to the constraints associated with Seller's financial distress and the limitations imposed upon Seller by the Bankruptcy Code.

      **5.4**    **Conduct of Business**.  From the Execution Date until the Closing, except as may be first approved in writing by Buyer or as is otherwise permitted or contemplated by this Agreement, Seller shall use commercially reasonable efforts to conduct the Business, and all transactions with respect to the Purchased Assets, only in the ordinary course of business consistent with Seller's past practice, subject to the constraints associated with Seller's financial distress and the limitations imposed upon Seller by the Bankruptcy Code.

      **5.5**    **No Sale of Assets Outside of Ordinary Course of Business**.  From the Execution Date until the Closing, Seller shall make no sale of Purchased Assets other than in the ordinary course of business consistent with Seller's past practice.

      **5.6**    **Access to Information and Premises**.  From the Execution Date until the Closing, Seller shall afford to representatives of Buyer reasonable access to Seller's premises, upon written prior notice and appointment, for the purposes of inspecting the Purchased Assets and examining the Books and Records and contracts of Seller; _provided_, however, that any such inspection shall be conducted in a manner that is not disruptive to the operation of the Business.

      **5.7**    **Sale Procedure Motion.**  On or before the third (3rd) Business Day after the Execution Date, Seller shall file in the Bankruptcy Court a motion ("**Sale Procedures Motion**") to obtain entry of a Sale Procedures Order on terms materially the same as that set forth in Exhibit E attached hereto, and shall use its commercially reasonable efforts to obtain from the Bankruptcy Court entry of the Sale Procedures Order by December 24,  2014.

**5.8**    **Sale Motion**.  On or before the fourteenth (14th) Business Day after the Execution Date, Seller shall file in the Bankruptcy Court a motion ("**Sale Motion**"), under sections 363 and 365 of the Bankruptcy Code, pursuant to which Seller shall use its commercially reasonable efforts to obtain from the Bankruptcy Court an order, in a form mutually acceptable to Seller and Buyer, approving Seller's sale and assignment to Buyer of the Purchased Assets in accordance with the terms of this Agreement ("**Sale Order**").  The Sale Order shall provide, in part, as follows: the Purchased Assets shall be transferred to Buyer free and clear of all Liens (except for the Permitted Liens); the Assumed Contracts shall be assigned to Buyer pursuant to section 365 of the Bankruptcy Code; Buyer is found to be a buyer in good faith within the meaning of section 363(m) of the Bankruptcy Code; and the stay of the effectiveness of the Sale Order pursuant to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure ("**Federal Bankruptcy Rules**") shall be waived; provided, however, that, if notwithstanding Seller's commercially reasonable efforts, the Bankruptcy Court does not authorize the assignment to Buyer of an Assumed Contract (including, without limitation, an Intellectual Property Agreement), such lack of assignment of such Assumed Contract shall not constitute a breach of Seller's obligations under this Agreement, but may authorize Buyer to exercise any rights that it may have under Section 11.1 hereof.  If an appeal of the Sale Order is filed timely pursuant to Rule 8002 of the Federal Bankruptcy Rules ("**Appeal**"), Seller shall use commercially reasonable efforts to defend such Appeal.

**5.9**    **Confidentiality**. Seller acknowledges and agrees that it has had access to or contributed to information and materials of a highly sensitive nature (including Confidential Information) relating to the Business, the Purchased Assets and the Assumed Liabilities.  Seller agrees that, unless Seller first obtains the written consent of an authorized officer of Buyer, Seller shall not disclose to any other Person any Confidential Information except to the extent that such

Person has executed and delivered to Seller a confidentiality agreement in a form reasonably acceptable to Buyer, or such disclosure is required by law or order of any Governmental Entity (in which event Seller shall, to the extent practicable, inform Buyer in advance of any such required disclosure, shall cooperate with Buyer in all reasonable ways in obtaining a protective order or other protection in respect of such required disclosure, and shall limit such disclosure to the extent reasonably possible while still complying with such requirements).  Seller shall use all reasonable care to safeguard Confidential Information and to protect it against disclosure, misuse, espionage, loss and theft.  Promptly after the Closing, Seller shall deliver to Buyer, or shall destroy, all Confidential Information and other Intellectual Property relating to the Purchased Assets in Seller's possession and control, in whatever form or medium.  Without limiting the generality of the foregoing, Seller agrees that, at the Closing, it shall deliver (or cause to be delivered) to Buyer all Software (including any and all source code, object code, executable code and binary code) comprising any part of the Purchased Assets.  If Buyer requests, Seller shall provide promptly written confirmation and certification that Seller has returned or destroyed all such materials.

    **5.10**   **No Covenants Regarding Assignment of Nonassignable Assets.**  Seller hereby makes no representation, warranty, covenant or agreement to assign to Buyer, and Seller shall not be obligated hereunder to cause to be assigned to Buyer, any Nonassignable Asset.

**ARTICLE VI.**

**COVENANTS OF BUYER**

    Buyer hereby covenants and agrees that, from the Execution Date until the Closing, it will act as follows:

13

**6.1** **Buyer's Reasonable Efforts to Consummate Agreement**. From the Execution Date until the Closing, subject to the terms and conditions of this Agreement, Buyer shall use commercially reasonable efforts to take, or cause to be taken, all acts on its part as may be advisable to consummate and to make effective the Transaction. Without limiting the generality of the foregoing:

**6.1.1** **Entry of Sale Procedures Order.** Buyer shall take promptly such actions as are reasonably requested by Seller or ordered by the Bankruptcy Court to assist in obtaining entry of the Sale Procedures Order.

**6.1.2** **Entry of Sale Order.** Buyer shall take promptly such actions as are reasonably requested by Seller or ordered by the Bankruptcy Court to assist in obtaining entry of the Sale Order and a finding of adequate assurance of future performance by Buyer under the Assumed Contracts as required by section 365(b)(1)(C) of the Bankruptcy Code, including, without limitation, furnishing affidavits, non-confidential financial information, confidential information subject to a reasonable form of confidentiality agreement, or other documents or information for filing with the Bankruptcy Court, and shall make its employees and representatives available to be interviewed by Seller's attorneys and to testify before the Bankruptcy Court in connection with the foregoing.

**6.1.3** **Objection to Sale Motion.** If any party files a written objection to the Sale Motion that, if upheld, would prohibit or otherwise prevent the Closing from occurring pursuant to the terms of this Agreement, Buyer shall use commercially reasonable efforts to have such objection overruled.

**6.1.4** **Appeal of Sale Order.** If any party timely files an Appeal of the Sale Order, Buyer shall use commercially reasonable efforts to defend such Appeal.

14

**6.2**    **Consents of Buyer**.  Buyer shall use commercially reasonable efforts to obtain, or cause to be obtained, all appropriate releases, consents, waivers and approvals as may be advisable to consummate and to make effective the Transaction.

## ARTICLE VII.

## SELLER'S REPRESENTATIONS AND WARRANTIES

Seller represents and warrants that:

**7.1**    **Organization**.  Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.

**7.2**    **Power and Authority**.  Subject to the approval of the Bankruptcy Court, Seller has all requisite power and authority to enter into this Agreement and to carry out all of its obligations under this Agreement.  The individual who shall execute and deliver this Agreement on behalf of Seller shall have been duly authorized to do so by all requisite action on the part of Seller.  Subject to the approval of the Bankruptcy Code, this Agreement is a valid and binding obligation of Seller and is enforceable against Seller, in accordance with the terms of this Agreement.

**7.3**    **No Conflicts**.  Neither the execution nor the performance of this Agreement by Seller will conflict materially with or result in any material violation of or constitute any material default under (i) Seller's Organizational Documents; (ii) any Assumed Contract; (iii) any statute, law, rule or regulation of any Governmental Entity; or (iv) any material stipulation, judgment, writ, injunction, decree or order of any court or other Governmental Entity relating to Seller.

**7.4**    **No Brokers or Finders**.  Except only for GlassRatner Advisory & Capital Group, LLC, no person or entity has, or as a result of the Transaction will have, as a result of any

commitment of Seller, any right, interest or valid claim for any commission, fee or other

compensation as a broker, finder or attorney or for acting in any similar capacity.

**7.5    Pending Actions**.  To the best of Seller's knowledge, there are no Actions pending

or threatened against or affecting Seller that might reasonably be expected to affect Seller's ability

to consummate this Agreement, and Seller is not aware of any circumstances that might result in

any such Action.

**7.6    Consents.**  Except for the entry of the Sale Order, any consents that may be required

in connection with an assignment to Buyer of an Assumed Contract, and as otherwise provided by

this Agreement, no consent, approval, authorization, permit, order, filing, registration or

qualification of or with any court, Governmental Entity or third person is required to be obtained by

Seller in connection with the execution and delivery by Seller of this Agreement or the

consummation by Seller of the Transaction.

**7.7    Sufficiency of Purchased Assets.**  The Purchased Assets are sufficient for the

continued conduct by Buyer of the Business after the Closing in substantially the same manner as

conducted prior to the Closing, and the Purchased Assets constitute all of the rights, property and

assets necessary to conduct the Business in substantially the same manner as currently conducted.

None of the Excluded Assets are material to the operation of the Business after the Closing.

**7.8    Intellectual Property**.  Seller represents and warrants the following regarding the

Intellectual Property:

**7.8.1    Owned IP.**  Exhibit F sets forth a complete and accurate list of (i) all Owned

IP that is registered or is subject to a pending application for registration in the United States

or any foreign jurisdiction including (a) patents, (b) registrations for any Marks, (c)

copyright registrations, (d) internet domain name registrations, (e) registrations for any other forms of Intellectual Property, and (f) any applications for registration of any of the foregoing, and (ii) any unregistered Marks constituting part of the Owned IP.

    7.8.2    **Ownership of and Rights in Owned IP.**  With respect to each item of Owned IP, except as set forth on Exhibit F: (i) Seller is the sole owner and possesses all right, title, and interest in and to the item; (ii) Seller has not granted to any Person any rights in or to such item or entered into any Intellectual Property Agreement with respect to such item; (iii) no Action is pending or, to Seller's knowledge, is threatened that challenges the validity, enforceability, registration, ownership or use of the item; (iv) the item is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge; and (v) Seller has not agreed to defend or indemnify any Person for or against any Infringement with respect to the item.

    7.8.3    **No Infringement.**  To Seller's knowledge, Seller has not Infringed any Intellectual Property rights of any other Person and, to Seller's knowledge, no Person has Infringed any Intellectual Property rights of Seller.  Except as set forth in Exhibit F, to Seller's knowledge, no Action is pending or threatened with respect to any such Infringement.

    7.9    **No Other Representations**.  Except as set forth expressly to the contrary in this Article VII, Seller hereby makes no representation or warranty, expressed or implied, to Buyer and hereby disclaims any representation or warranty, express or implied, with respect to the Business, the Purchased Assets, or any other matter, including any representation or warranty as to merchantability or fitness for a particular purpose of the Purchased Assets or as to the future results of the Business.  Without limiting the generality of the foregoing, Buyer hereby acknowledges and

agrees that it is purchasing the Purchased Assets on an "AS IS," "WHERE IS" and "WITH ALL FAULTS" basis.

## ARTICLE VIII.

### BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants that:

**8.1** **Organization**. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of California.

**8.2** **Power and Authority**. Buyer has all requisite power and authority to enter into this Agreement and to carry out all of its obligations under this Agreement. The individual who shall execute and deliver this Agreement on behalf of Buyer shall have been duly authorized to do so by all requisite action on the part of Buyer. This Agreement is a valid and binding obligation of Buyer and is enforceable against Buyer, in accordance with the terms of this Agreement.

**8.3** **No Conflicts.** Neither the execution nor the performance of this Agreement by Buyer will conflict materially with or result in any material violation of or constitute a material default under: (i) Buyer's organizational documents; (ii) any material arrangement, agreement, mortgage, indenture, license, permit, lease, instrument or other Contract to which Buyer is a party or by which Buyer is bound; (iii) any statute, law, rule or regulation of any Governmental Entity; or (iv) any material stipulation, judgment, writ, injunction, decree or order of any court or other Governmental Entity relating to Buyer.

**8.4** **No Brokers or Finders**. No person or entity has, or as a result of the Transaction will have, as a result of any commitment of Buyer, any right, interest or valid claim against Seller

MAINDOCS-#207396-v5-BrandAffinity-Asset_Purchase_Agreement.docx

for any commission, fee or other compensation as a broker, finder or attorney or for acting in any similar capacity.

**8.5    Pending Actions**.  To the best of Buyer's knowledge, there are no Actions pending or threatened against or affecting Buyer that might reasonably be expected to affect Buyer's ability to consummate this Agreement, and Buyer is not aware of any circumstances that might result in any such Action.

**8.6    Consents**.  Except for the entry of the Sale Order, no consent, approval, authorization, permit, order, filing, registration or qualification of or with any court, Governmental Entity or third person is required to be obtained by Buyer in connection with the execution and delivery by Buyer of this Agreement or the consummation by Buyer of the Transaction.

**8.7    Buyer's Investigation**.  Buyer has made such investigation as it has deemed appropriate in connection with the decision to enter into this Agreement.  Buyer has had the opportunity to inspect the Purchased Assets, visit with Seller and meet with Seller's representatives to discuss the Business.  Buyer is relying on the results of such investigation and the advice of its own advisors and has not relied upon any statement or representation made by Seller or any director, officer, employee, agent, representative, attorney, accountant, or affiliate of Seller, other than the covenants, representations and warranties of Seller set forth in this Agreement.

**8.8    Buyer's Financial Condition.**

**8.8.1    Solvency.**  As of the Closing Date and immediately after consummating the Transaction contemplated by this Agreement, Buyer will not (i) be insolvent (either because its financial condition is such that the sum of its debts is greater than the fair value of its assets or because the fair value of its assets will be less than the amount required to pay its

probable liabilities as they become due and payable), (ii) have unreasonably small capital

with which to engage in its business, or (iii) have incurred or planned to incur debts beyond

its ability to repay such debts as they mature.

     **8.8.2**   **Availability of Funds.** As of the Closing, Buyer will have cash and working

capital available to Buyer that will be sufficient to enable Buyer to pay the Purchase Price

and any other amounts required hereunder and to consummate the Transaction contemplated

hereby. Buyer acknowledges that its obligation to consummate this Agreement and the

Transaction contemplated hereby is not subject to any financing contingency.

## ARTICLE IX.

## CLOSING OF THE TRANSACTION

     **9.1**   **The Closing.** Unless this Agreement has been terminated pursuant to Section 13.1

of this Agreement, the closing of the Transaction contemplated by this Agreement ("**Closing**") shall

be held within three (3) business days after the satisfaction of all conditions set forth in Sections

11.1 and 11.2 hereof, or on such other date as Buyer and Seller mutually agree in writing ("**Closing**

**Date**"). The Closing shall take place at the law office of Winthrop Couchot Professional

Corporation, or at such other location as Buyer and Seller mutually agree in writing.

     **9.2**   **Seller's Obligations at Closing.** At the Closing, Seller shall take the following acts:

     **9.2.1**   **Possession of the Purchased Assets.** Seller shall relinquish and deliver to

Buyer immediate possession of the Purchased Assets.

     **9.2.2**   **Closing Documents from Seller.** Seller shall execute and deliver to Buyer

the following documents: (i) a Bill of Sale in substantially the form of Exhibit G hereto

("**Bill of Sale**"); (ii) an Assignment and Assumption Agreement in substantially the form of

Exhibit H hereto ("**Assignment Agreement**"); and (iii) such other documents as may be reasonably requested by Buyer in connection with the consummation of the Transaction.

**9.3**    **Buyer's Obligations at Closing**.  At the Closing, Buyer shall take the following acts:

**9.3.1**    **Payment of Purchase Price**.  Buyer shall authorize the Purchase Deposit to be released and delivered to Seller, and shall pay to Seller the Closing Date Cash Payment.

**9.3.2**    **Closing Documents from Buyer**.  Buyer shall execute and deliver to Seller the following documents:  (i) a copy of the Assignment Agreement; (ii) copies, certified by the appropriate governmental official of the state in which Buyer is organized, of Buyer's organizational documents, and all amendments thereto; (iii) a certificate, satisfactory to Seller, relating to Buyer's having taken all acts under its organizational documents appropriate for authorizing the Transaction; and (iv) such other documents as may be reasonably requested by Seller in connection with the consummation of the Transaction.

**9.4**    **Effectiveness of Agreement**.  This Agreement, and all of the terms and conditions hereof, shall be effective and binding upon the Parties upon the satisfaction or waiver of the conditions set forth in Sections 11.1 and 11.2 hereof; provided, however, that the following provisions of this Agreement shall be effective upon the Execution Date:  Article IV; Article V; Article VI; Article VII; Article VIII; Article XI; Article XIII and Article XVI.

## ARTICLE X.

## DELIVERY AND CONDITION OF THE PURCHASED ASSETS

**10.1**    **Transfer of Purchased Assets**.  Immediately as of the Closing, Seller shall be deemed to have fully and completely transferred to Buyer all of Seller's rights, title and interests, if

any, in, as well as possession, custody and control of, the Purchased Assets. Seller shall not be liable or responsible for any liabilities or obligations of any kind or nature whatsoever arising out of, under, or related to the Purchased Assets from and after the Closing. Without limiting the generality of the foregoing, in accordance with the provisions of section 365(k) of the Bankruptcy Code, Seller shall have no liability arising from and after the Closing pursuant to any Assumed Contracts.

    **10.2**    <u>**As Is, Where Is**</u>. Buyer acknowledges and agrees that it is purchasing, and shall take possession of, the Purchased Assets in their "AS IS, WHERE IS" and "WITH ALL FAULTS" condition and that it has previously been given the opportunity to conduct, and has conducted, such investigations and inspections of the Purchased Assets as it has deemed necessary or appropriate for the purposes of this Agreement.

    **10.3**    <u>**No Warranties Regarding Purchased Assets**</u>. **SELLER MAKES NO REPRESENTATIONS, STATEMENTS OR WARRANTIES, EXPRESS OR IMPLIED, OF ANY KIND OR NATURE WHATSOEVER CONCERNING THE PURCHASED ASSETS, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES REGARDING THE CONDITION, QUANTITY OR QUALITY OF ANY OR ALL OF THE PURCHASED ASSETS OR CONCERNING THE PAST, PRESENT OR FUTURE PROFITABILITY OR VIABILITY OF THE BUSINESS, AND ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE DISCLAIMED HEREBY BY SELLER.**

## ARTICLE XI.

## CONDITIONS PRECEDENT TO CLOSING

**11.1    Buyer's Conditions to Closing**.  The obligation of Buyer to proceed with the

Closing of this Agreement is subject to the satisfaction of all of the conditions set forth in this

Section 11.1.

**11.1.1    Title to Purchased Assets**.  In accordance with the provisions of the Sale

Order, title to the Purchased Assets, including the Owned IP, shall be delivered to Buyer at

the Closing free and clear of all Liens, except only for any Permitted Liens, and the

Assumed Contracts, including the Intellectual Property Agreements listed on Exhibit A

hereto, shall be assigned to Buyer in accordance with the provisions of the Assignment

Agreement.

**11.1.2    Bill of Sale**.  Buyer shall have received the Bill of Sale, in a form

materially the same as that set forth in Exhibit G hereto, or otherwise in a form acceptable to

Buyer and to its counsel.

**11.1.3    No Proceedings Adverse to Buyer.**  On the Closing Date, no Action

including any Action of a Governmental Entity, shall be pending before any court,

regulatory entity or other Governmental Entity that seeks to restrain or to prohibit the

consummation of the Transaction, or to obtain from Buyer damages or other material relief

in connection with this Agreement or the consummation of the Transaction.

**11.1.4    Seller's Covenants, Agreements and Conditions**.  Seller shall have

performed, satisfied and complied in all material respects with all covenants, agreements

and conditions that it is required by this Agreement to perform, satisfy or comply with, before or at the Closing.

**11.1.5    Seller's Representations and Warranties.**  All representations and warranties made by Seller pursuant to this Agreement shall be true in all material respects as of the Closing Date as though such representations and warranties were made on and as of that date.

**11.1.6    Seller's Authorization.**  The execution and delivery of this Agreement by Seller, and the performance of Seller's covenants and obligations under this Agreement, shall have been duly authorized by all necessary action by Seller, and Buyer shall have received copies of all resolutions pertaining to that authorization.

**11.1.7    Seller's Documents.**  The form and substance of all documents delivered to Buyer under this Agreement shall be acceptable to Buyer, which acceptance shall not be unreasonably withheld by Buyer.

**11.1.8    Sale Order Acceptable to Buyer.**  The Bankruptcy Court shall have entered the Sale Order on terms acceptable to Buyer, which acceptance shall not be unreasonably withheld by Buyer, and no Appeal of the Sale Order is filed timely pursuant to the Federal Bankruptcy Rules, or if an Appeal is filed timely, no stay of the execution of the Sale Order ("**Stay**") is issued pending resolution of the Appeal.  Absent a Stay, the lack of any pending Appeal of the Sale Order shall not be a condition of the Closing, provided that the Bankruptcy Court makes a finding that Buyer is a buyer in good faith within the meaning of section 363(m) of the Bankruptcy Code.

MAINDOCS-#207396-v5-BrandAffinity-Asset_Purchase_Agreement.docx

**11.1.9    No Material Adverse Effect.**  There shall not have occurred any Material

Adverse Effect from and after the Execution Date.

**11.2    Seller's Conditions to Closing.**  The obligations of Seller to proceed with the

Closing of this Agreement are subject to the satisfaction of all of the conditions set forth in this

Section 11.2.

**11.2.1    No Proceedings Adverse to Seller.**  On the Closing Date, no Action,

including any Governmental Entity, shall be pending before any court, regulatory entity or

other Governmental Entity that seeks to restrain or to prohibit the consummation of the

Transaction, or to obtain from Seller damages or other material relief in connection with this

Agreement or the consummation of the Transaction.

**11.2.2    Buyer's Covenants, Agreements and Conditions.**  Buyer shall have

performed, satisfied and complied in all material respects with all covenants, agreements

and conditions that it is required by this Agreement to perform, satisfy or comply with,

before or at the Closing, including, without limitation, payment of the Purchase Price.

**11.2.3    Buyer's Representations and Warranties.**  All representations and

warranties made by Buyer pursuant to this Agreement shall be true in all material respects as

of the Closing Date as though such representations and warranties were made on and as of

that date.

**11.2.4    Buyer's Authorization.**  The execution and delivery of this Agreement by

Buyer, and the performance of Buyer's covenants and obligations under this Agreement,

shall have been duly authorized by all necessary action by Buyer, and Seller shall have

received copies of all resolutions pertaining to that authorization.

MAINDOCS-#207396-v5-BrandAffinity-Asset_Purchase_Agreement.docx

**11.2.5    Buyer's Documents.**  The form and substance of all documents delivered to Seller under this Agreement shall be acceptable to Seller, which acceptance shall not be unreasonably withheld by Seller.

**11.2.6    Sale Order Acceptable to Seller.**  The Bankruptcy Court shall have entered the Sale Order on terms acceptable to Seller, which acceptance shall not be unreasonably withheld by Seller, and no Appeal is filed timely, or if an Appeal is filed timely, no Stay is issued pending the resolution of the Appeal.  Absent a Stay, the lack of any pending Appeal of the Sale Order shall not be a condition to the Closing.

**11.3    Waiver of Conditions.**  Any or all of the foregoing conditions may be waived in whole or in part by a prior writing executed by the Party on whose behalf such condition is included herein.

**11.4    Buyer's Obtaining Nonassignable Assets.**  Buyer hereby acknowledges and agrees that (i) Seller hereby makes no representation or warranty of any nature whatsoever regarding Seller's ability to transfer and assign to Buyer any interest of Seller in any Nonassignable Asset, and (ii) Buyer's obtaining an assignment of Seller's interest under any such Nonassignable Asset is not a condition to Buyer's obligation to proceed with the Closing of the Transaction.

**11.5    Buyer's Obtaining Financing.**  Buyer hereby acknowledges and agrees that Buyer's obtaining financing to fund the payment of all or a portion of the Purchase Price is not a condition to Buyer's obligation to proceed with the Closing of the Transaction.

## ARTICLE XII.

### **EMPLOYEES**

Buyer shall have no obligation to continue to employ, after the Closing Date, any employees employed by Seller.  On or as soon as practicable after the Execution Date, Buyer shall provide to Seller a list of all employees of Seller whom Buyer desires to employ.  Buyer may interview such employees during normal business hours of Seller, after given reasonable prior written notice to Seller, and without causing any disruption to the operation of the Business.  Seller hereby makes no representation or warranty of any nature whatsoever regarding whether any such employees of Seller whom Buyer desires to employ will agree to be employed by Buyer or regarding the terms and conditions of any such employment.

## ARTICLE XIII.

### **TERMINATION OF THIS AGREEMENT**

**13.1**    **Termination**.  This Agreement may be terminated at any time prior to the Closing as follows:

**13.1.1**    **Buyer's Termination of Agreement Under Article IV.**  By Buyer, at its option, if Buyer elects to terminate this Agreement in accordance with the provisions of Article IV hereof.

**13.1.2**    **Breach by Seller.**  By Buyer, at its option, if there is a material breach by Seller of any representation or warranty of Seller set forth herein or any covenant or agreement to be complied with or performed by Seller pursuant to the terms of this Agreement, or a failure by Seller to satisfy a condition set forth in Section 11.1 hereof (and

such condition is not waived in writing by Buyer), or the occurrence of any event which results or would result in the failure of a condition set forth in Section 11.1 hereof.

**13.1.3** **Breach by Buyer.** By Seller, at its option, if there is a material breach by Buyer of any representation or warranty of Buyer set forth herein or of any covenant or agreement to be complied with or performed by Buyer pursuant to the terms of this Agreement, or a failure by Buyer to satisfy a condition set forth in Section 11.2 hereof (and such condition is not waived in writing by Seller), or the occurrence of any event which results or would result in the failure of a condition set forth in Section 11.2 hereof, including, without limitation, Buyer's failure to pay timely the Purchase Price.

**13.1.4** **Failure to File Timely Sale Procedures Motion.** By Buyer, if Seller fails to file the Sale Procedures Motion within three (3) Business Days after the Execution Date.

**13.1.5** **Mutual Consent.** By mutual written consent of Buyer and Seller.

**13.1.6** **Order Restraining Consummation of Transaction.** By either Buyer or Seller, if a court of competent jurisdiction or other Governmental Entity shall have issued a non-appealable final order, decree or ruling or taken any other action, in each case having the effect of permanently restraining, enjoining or otherwise prohibiting the consummation of the Transaction, except, if the Party relying on such order, decree or ruling or other action has not complied with its obligations with respect thereto under this Agreement.

**13.1.7** **Deadline for Closing.** By either Buyer or Seller, if the Closing shall not have occurred by February 17, 2015 (provided that the right to terminate this Agreement under this Section 13.1.8 shall not be available to the Party seeking to terminate this Agreement if any failure by such Party to fulfill any obligation of such Party under this

MAINDOCS-#207396-v5-BrandAffinity-Asset_Purchase_Agreement.docx

Agreement is the cause of or results in the failure of the Closing to occur on or before such date).

    **13.1.8**   **Alternate Transaction.** By Buyer or Seller, if pursuant to the Sale Order, the Bankruptcy Court approves another transaction regarding a sale of the Purchased Assets (or any significant portion thereof), or another similar acquisition of the Business, and such transaction thereafter closes ("**Alternate Transaction**"). Buyer hereby acknowledges and agrees that no "break-up fee" or other fee or payment shall be payable to Buyer as a result of or in connection with the Closing of any Alternate Transaction.

    **13.2**   **Effect of Termination**. In the event of any termination of this Agreement as permitted by Section 13.1 hereof, this Agreement shall forthwith become void and no Party shall have any liability or further obligation to the other Party under or by reason of this Agreement or the Transaction contemplated hereby, except for any breach of this Agreement occurring prior to or as a result of a termination of this Agreement, and except that Seller shall return to Buyer the Purchase Deposit, and each Party shall redeliver to the other Party all documents, work papers, and other materials of the other Party relating to the Transaction contemplated hereby, whether obtained by such Party before or after the execution hereof. Any termination of this Agreement shall not relieve any defaulting or breaching Party from any liability to the other Party as a result of such breach or default under this Agreement. In the event of any termination of this Agreement, any non-defaulting and non-breaching Party shall reserve all rights and remedies available under applicable law to such Party as a consequence of the other Party's breach or default under this Agreement; without limiting the generality of the foregoing, in the event of any breach or default by Buyer of any of its agreements, commitments, representations, warranties, covenants or obligations

hereunder, Seller shall have the right to retain the Purchase Deposit and to pursue against Buyer all additional rights and remedies of Seller.

**13.3    Extension; Waiver.**  At any time prior to the Closing Date, Buyer or Seller may (i) extend the time for the performance for its behalf of any of the obligations or other acts of the other Party, (ii) waive any inaccuracies in the representations and warranties given by the other Party herein or in any document delivered pursuant hereto, and (iii) waive compliance with any of the agreements or conditions contained for its behalf herein.  Any agreement on the part of a Party to any such extension or waiver shall be valid only if set forth in a written instrument signed on behalf of such Party.

**13.4    Notice of Termination.**  Any Party terminating this Agreement pursuant to Section 13.1 hereof shall give immediate written notice of such termination to the other Party at the addresses to which notices must be provided pursuant to Section 16.13 hereof, specifying in the notice the provision of this Agreement pursuant to which the termination is made.

## ARTICLE XIV.

## SELLER'S OBLIGATIONS AFTER CLOSING

**14.1    Seller's Further Assurances.**  Within ninety (90) days after the Closing, Seller shall cooperate fully with Buyer in the performance of this Agreement, without material expense to Seller, and shall execute such additional agreements, documents and instruments as may reasonably be required to carry out the intent of the Parties with respect to this Agreement.  Seller shall have no further obligations hereunder to Buyer after ninety (90) days after the Closing.

**14.2    Seller's Name.**  Seller shall change its name from "Brand Affinity Technologies" within three (3) Business Days after the Closing, and Seller shall use commercially reasonable

efforts to cease after the Closing use of the name "Brand Affinity Technologies" and any Mark,

except only as may be appropriate to wind up the administration of the Bankruptcy Case or to

collect any Account Receivable.

## ARTICLE XV.

### BUYER'S OBLIGATIONS AFTER CLOSING

**15.1    Proration**.  Buyer shall pay timely, from and after the Closing Date, all Assumed

Liabilities and Buyer's portion, prorated as of the Closing Date, of Taxes and fees assessed against

the Purchased Assets, utility costs, charges and expenses and all other costs, charges and expenses

affecting the Purchased Assets or the Business arising from and after the Closing.

**15.2    Buyer's Further Assurances**.  After the Closing, Buyer shall cooperate fully with

Seller in the performance of this Agreement, and shall execute such additional agreements,

documents or instruments as may be reasonably appropriate to carry out the intent of the Parties

with respect to this Agreement.

**15.3    Preservation of Financial Books and Records**.  Following the Closing, Buyer shall

preserve the Books and Records for one (1) year from the Closing. During that period, Buyer shall

provide Seller's representatives with reasonable access to the Books and Records and copies of the

Books and Records, where appropriate to promote the administration of Seller's Bankruptcy Case.

Without limiting the generality of the foregoing, Buyer shall retain all Books and Records of every

kind that relate to any Taxes of Seller.  Seller shall not destroy or otherwise dispose of any Books or

Records without first providing to Seller a reasonable opportunity to review and copy the same.

**15.4    Buyer's Indemnity**.  Buyer shall indemnify and hold harmless Seller and its

officers, directors, shareholders, employees, principals, agents, attorneys and representatives

against, and in respect of, any and all claims, losses, expenses, costs, obligations, and liabilities (including, without limitation, any interest, penalties, charges, legal fees and costs and accountants' fees and costs) (collectively, **"Losses"**) incurred by any of them in connection with and in defending against any such Losses by reason of any of the following:  (i) Buyer's breach, after the Closing Date, of any of its agreements, commitments, representations, warranties,  covenants or obligations in this Agreement; (ii) the ownership and operation of the Business or any of the Purchased Assets at any time after the Closing; (iii) any obligations or liabilities of Buyer incurred or arising out of, or in connection with, any act or omission by Buyer occurring at any time before or after the Execution Date of this Agreement; and (iv) the Assumed Liabilities.

**ARTICLE XVI.**

**MISCELLANEOUS**

16.1    **Modification**. This Agreement may not be modified or amended, except by an instrument in writing signed by both of the Parties.

16.2    **Waiver**. Acceptance by a Party of any performance less than required hereunder shall not be deemed to be a waiver of the rights of such Party to enforce all of the terms and conditions hereof.  No waiver of any such right hereunder shall be binding unless reduced to writing and signed by the Party to be charged therewith.

16.3    **Counterparts; Facsimile or Electronic Signature**. This Agreement may be signed in any number of counterparts with the same effect as if the signatures appeared on the same instrument, and all signed counterparts shall be deemed to be an original.  Facsimile or electronic transmission of any signed original document, and retransmission of any signed facsimile or electronic transmission, shall be the same as delivery of an original.

**16.4    Authorized Execution**. Each individual executing this Agreement on behalf of a Party represents and warrants that (i) he is authorized to execute this Agreement for such Party, and (ii) such Party shall be bound in all respects hereby.

**16.5    Attorneys' Fees and Costs**. Each Party shall bear its own attorneys' fees and costs arising from or related to the negotiation and execution of this Agreement. In the event of any Action to enforce, modify, interpret, construe, invalidate, rescind, or set aside any term or provision of this Agreement, however, the prevailing Party shall be entitled to an award of its costs and expenses, including reasonable attorneys' fees and costs, incurred as a result of such Action, including any appeals resulting therefrom.

**16.6    Governing Law; Choice of Forum**. This Agreement shall be construed and enforced according to the laws of the State of California, without reference to conflicts of law principles. Any Action brought to enforce, modify, interpret, construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement may be brought only in the Bankruptcy Court (subject only to the right of appeal). Each of the Parties hereby consents to the exclusive jurisdiction of the Bankruptcy Court to enforce the provisions of this Agreement and for all such matters, and hereby waives any objection that it may have to such jurisdiction. Notwithstanding the foregoing, in the event that the Bankruptcy Case should be closed or dismissed, any Action to enforce, modify, interpret, construe, invalidate, rescind or set aside any of the terms or provisions of this Agreement shall be brought only in the state courts of California sitting in Orange County, California.

**16.7    Severability**. If any part of this Agreement shall be determined to be illegal, invalid or unenforceable, that part shall be severed from the Agreement and the remaining parts shall be

valid and enforceable, so long as the remaining parts continue to fulfill the original intent of the Parties.

   **16.8    Free and Voluntary Act**. The Parties hereby acknowledge and agree that they have read carefully this Agreement, know the contents thereof, have discussed them with legal counsel or have decided not to consult with legal counsel, and sign the same of their own free and voluntary act with the intent to be legally bound thereby.

   **16.9    No Construction against any Party; Headings for Convenience Only**. The Parties have cooperated in the drafting and preparation of this Agreement. In any construction of this Agreement, or of any of its terms and provisions, the same shall not be construed against either Party. All headings in this Agreement are inserted for convenience of reference only, and shall not affect the construction or interpretation hereof.

   **16.10    Reliance on Representations**. Each Party specifically acknowledges that it has not relied on any statement, representation, or promise of the other Party or of any of the other Party's agents, employees, attorneys, or representatives, in executing this Agreement, except as expressly set forth herein.

   **16.11    Entire Agreement**. This Agreement constitutes the entire agreement of the Parties with respect to the matters set forth herein, and supersedes any and all prior agreements or understandings, written or oral, between them relating to the subject matter of this Agreement. No other promises or agreements shall be binding upon the Parties with respect to this subject matter unless contained in this Agreement or separately agreed to in writing and signed by an authorized representative of each Party.

**16.12  Bankruptcy Court Approval**. Each Party shall take any and all acts, and execute any and all further documents, that may be reasonably necessary or appropriate to obtain Bankruptcy Court approval of this Agreement.

**16.13  Notices**. All notices, requests, demands, and other communications required by this Agreement shall be in writing and shall be delivered by facsimile, e-mail transmission, or in person, or mailed by first class registered or certified mail, as follows:

If Directed to Seller:

Brand Affinity Technologies, Inc.
101 Academy Way, Suite 110
Irvine, CA 92617
Attn: Mydung Tran
Tel.: (949) 612-9533
Fax: (949) 242-7985
Email: mydung@brandaffitnity.net

With a copy to:

Winthrop Couchot Professional Corporation
660 Newport Center Drive #400
Newport Beach, CA 92660
Attn: Robert E. Opera, Esq.
Tel.: (949) 720-4130
Fax: (949) 720-4111

If directed to Buyer:

Creekside Investment Management, LLC
514 30th Street
Newport Beach, CA 92663
Attn: Ryan Steelberg
Tel.: (949) 689-8379
Email: ryan@steelberg.com

If delivered by facsimile, by e–mail transmission, or personally, the date on which the notice, request, demand or other communication is delivered, and a copy thereof is sent by first class mail, postage prepaid, addressed to the addresses required by this Section 16.13, shall be the date on which such delivery is made.  If such notice, request, demand or other communication is delivered by first class mail, the date on which such notice, request, demand or other communication is received shall be the date of delivery.  A Party may designate in writing a different address to which any notice, request, demand or other communication is to be given hereunder to such Party. Telephone numbers are listed for convenience purposes only and not for the purpose of giving notice pursuant to this Agreement.

16.14    **Interpretation.**  Wherever in this Agreement the context so requires, reference to the neuter, masculine or feminine shall be deemed to include each of the others, and reference to either the singular or the plural shall be deemed to include the other.

16.15    **Further Assurances.**  Except as set forth expressly to the contrary in this Agreement, each Party, at the request of the other Party, shall execute and deliver to the requesting Party all such further documents, and shall take such further acts, as may be reasonably necessary or appropriate in order to confirm or carry out the provisions of this Agreement.

16.16    **Successors and Assigns.**  This Agreement shall be binding upon and inure to the benefit of the respective successors and assigns of the Parties.

16.17    **Survival.**  Except as set forth expressly to the contrary in Section 5.9, Article XIV and Article XV hereof, the representations, warranties and covenants contained herein shall not survive the Closing.

**16.18    Time of Essence**.  Time is of the essence in the performance of the Parties' respective obligations under this Agreement.

**16.19    Parties in Interest**.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the Parties and any of their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation of any third persons to a Party, nor shall any provision hereof give any third persons any right of subrogation or action over against a Party.

**16.20    Schedules and Exhibits**.  All schedules and exhibits are a part of this Agreement as if fully set forth herein.  All references to sections, articles, schedules and exhibits shall be deemed references to such parts of this Agreement, unless the context shall otherwise require.  Disclosure of any fact or item in any exhibit hereto referenced by a particular section in this Agreement shall, should the existence of the fact or item of its contents be relevant to any other section, be deemed to be disclosed with respect to that other section whether or not an explicit cross-reference thereto appears.  Any reference in this Agreement to an exhibit, schedule or to another document means such exhibit, schedule or other document as it has been, or may be, amended, modified, restated or supplemented as of the Closing, and any such exhibit, schedule or other document shall be deemed to be included in this Agreement regardless of when it is prepared or attached hereto.

**16.21    Solicitation**.  Buyer hereby acknowledges and agrees that Seller and its representatives, consistent with Seller's duties as debtor-in-possession in the Bankruptcy Case, shall have the right to enter into, solicit, initiate or continue any discussions or negotiations with, and/or encourage or respond to any inquiries or proposals by, or participate in any negotiations with or provide any information to, or otherwise cooperate in any manner with, any person or entity other than Buyer and its representatives concerning any sale of all or any portion of the Purchased Assets,

or of any shares of stock of Seller, or any merger, consolidation or similar transaction involving

Seller.

       **IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the Execution

Date.

**SELLER:**                       **BUYER:**
BRAND AFFINITY TECHNOLOGIES, INC.   CREEKSIDE INVESTMENT MANAGEMENT, LLC

_____    _____

By:_____      By:_____
Its:_____      Its:_____

## Appendix

The definitions of the capitalized terms used in this Agreement shall be as follows:

"**Accounts Receivable**" has the meaning set forth in Section 1.2.2 of this Agreement.

"**Action**" means any action, arbitration, cause of action, charge, claim, complaint, demand, grievance, hearing, inquiry, investigation, prosecution, proceeding or suit by or before any Governmental Entity or before any arbitrator, including, without limitation, any adversary proceeding filed in the Bankruptcy Court.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Alternate Transaction**" has the meaning set forth in Section 13.1.9 of this Agreement.

"**Appeal**" has the meaning set forth in Section 5.8 of this Agreement.

"**Assignment Agreement**" has the meaning set forth in Section 9.2.2 of this Agreement.

"**Assumed Contracts**" has the meaning set forth in Section 1.1.1 of this Agreement.

"**Assumed Liabilities**" has the meaning set forth in Article II of this Agreement.

"**Bankruptcy Case**" has the meaning set forth in Recital A to this Agreement.

"**Bankruptcy Court**" has the meaning set forth in Recital A to this Agreement.

"**Bill of Sale**" has the meaning set forth in Section 9.2.2 of this Agreement.

"**Books and Records**" means all books and records of Seller, including, but not limited to, books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Entity), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research, client files maintained by Seller's attorneys that relate to the Business, the Purchased Assets or the Assumed Liabilities, and files and records relating to the Owned IP and the Intellectual Property Agreements being sold, assigned, transferred or conveyed to Buyer; provided, however, that the foregoing shall not include any personnel records or other information which Seller, in the exercise of its sole and absolute discretion, determines that it may not disclose to Buyer under applicable law.

"**Business**" has the meaning set forth in Recital B to this Agreement.

"**Business Day**" means each day of the week except Saturdays, Sundays and days on which banking institutions are authorized by law to close in the State of California.

"**Buyer**" has the meaning set forth in the preamble to this Agreement.

"**Cash Consideration**" means $400,000, plus the amount of the Cure Costs.

"**Closing**" has the meaning set forth in Section 9.1 of this Agreement.

"**Closing Date**" has the meaning set forth in Section 9.1 of this Agreement.

"**Closing Date Cash Payment**" has the meaning set forth in Section 1.4.2. of this Agreement.

"**Confidential Information**" means all information (whether or not specifically identified as confidential), in any form or medium, that is disclosed to, or developed or learned by, Seller or that relates to the business, products, services or research of Seller or including, without limitation: (a) internal business information of Seller (including, without limitation, information relating to strategic plans and practices, business, accounting, financial or marketing plans, practices or programs, training practices and programs, salaries, bonuses, incentive plans and other compensation and benefits information and accounting and business methods); (b) identities of, individual requirements of, specific contractual arrangements with, and information about, Seller and its customers and their respective confidential information; (c) any confidential or proprietary information of any third party that Seller has a duty to maintain confidentiality of, or use only for certain limited purposes; (d) industry research compiled by, or on behalf of Seller, including, without limitation, identities of potential target companies, management teams, and transaction sources identified by, or on behalf of, Seller; (e) compilations of data and analyses, processes, methods, track and performance records, data and data bases relating thereto; and (f) information related to Intellectual Property of Seller and updates of any of the foregoing; provided, however, that "Confidential Information" shall not include any information that Seller can demonstrate has become generally known to and widely available for use within the industry other than as a result of the acts or omissions of Seller or a Person that Seller has direct control over to the extent such acts or omissions are not authorized by Seller in the performance of such Person's assigned duties for Seller.

"**Contract**" means any agreement, contract, instrument, commitment, lease, guaranty, mortgage, deed of trust, permit, indenture, license, or other arrangement or understanding (and all amendments, side letters, modifications and supplements thereto) between parties or by one party in favor of another party, whether written or oral.

"**Cure Costs**" has the meaning set forth in Section 1.3.2 of this Agreement.

"**ERISA**" has the meaning set forth in Section 3.2 of this Agreement.

"**Excluded Assets**" has the meaning set forth in Section 1.2 of this Agreement.

"**Excluded Liabilities**" has the meaning set forth in Article III of this Agreement.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Federal Bankruptcy Rules**" has the meaning set forth in Section 5.8 of this Agreement.

"**Governmental Entity**" means any (a) province, region, state, territory, county, city, town, village, district or other jurisdiction; (b) federal, provincial, regional, state, local, municipal, foreign or other

government; (c) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, department or other entity and any court or other tribunal including the Bankruptcy Court); (d) multinational organization; (e) body exercising, or entitled to exercise any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature; or (f) official of any of the foregoing.

"**Infringe**" means infringe, dilute, tarnish, pass off, conduct an act of unfair competition with respect to, misappropriate, cybersquat with respect to, or otherwise violate any Intellectual Property right.  The foregoing definition applies to any verbal variations of Infringe used in this Agreement, including Infringing and Infringed.

"**Infringement**" means any infringement of, dilution of, tarnishment of, passing off of, acts of unfair competition with respect to, misappropriation of, cybersquatting with respect to, or other violation of any Intellectual Property right.

"**Insurance Claims**" has the meaning set forth in Section 1.1.8 of this Agreement.

"**Intellectual Property**" means all domestic and foreign intellectual property and proprietary rights including, but not limited to: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, and all reissues, reexaminations, continuations in whole or in part, and rights in respect of utility models; (b) all Marks (whether or not registered), and all applications and registrations in connection therewith; (c) all copyrights and copyrightable works (whether or not published), and all website content, and all applications and registrations in connection therewith; (d) all mask works, industrial designs and protectible designs, and all applications and registrations in connection therewith; (e) all trade secrets and, whether or not confidential, all business information (including ideas, concepts, research and development information, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, research records, records of inventions, test information, financial, marketing and business data, customer and supplier lists and information, pricing and cost information, business and marketing plans and proposals); (f) all Software; (g) all data, databases and data collections, including customer and website visitor data and information, email addresses and other personally identifiable information; and (h) all internet domain names.

"**Intellectual Property Agreements**" means all licenses, sublicenses, covenants not to sue, non-assertion agreements, co-existence agreements, first or last rights of refusal, first or last rights of negotiation,  options, rights to purchase or license, escrow agreements, or other Contracts relating to the development, ownership, transfer, licensing or use of any Intellectual Property.

The term "**knowledge**" means, with respect to any Person, the actual knowledge after reasonable inquiry of any director, governing body member or executive officer of such Person.

"**Lien**" means any security interest, pledge, bailment (in the nature of a pledge or for purposes of security), mortgage, deed of trust, the grant of a power to confess judgment, conditional sales and title retention agreement (including any lease in the nature thereof), charge, encumbrance or other similar arrangement or interest in real or personal property.

"**Losses**" has the meaning set forth in Section 15.4 of this Agreement.

41
MAINDOCS-#207396-v5-BrandAffinity-Asset_Purchase_Agreement.docx

"**Mark**" means any trademark, service mark, trade dress, logo, slogan, brand name, trade name, corporate name or other indicia of origin.

"**Material Adverse Effect**" means any change, event, occurrence or circumstance that, individually or in the aggregate with all other changes, events, occurrences and circumstances, results in, or could reasonably be expected to result in, a material adverse effect on the Business, results of operations, condition (financial or otherwise), assets, or liabilities of Seller, or on the ability of Buyer or Seller to perform their respective obligations hereunder or to consummate the Transaction.

"**Nonassignable Asset**" has the meaning set forth in Section 1.2.6 of this Agreement.

The term "**ordinary course of business**" means the ordinary course of business consistent with past custom and practice, including as to frequency and amount.

"**Organizational Documents**" has the meaning set forth in Section 1.2.1 of this Agreement.

"**Owned IP**" means all Intellectual Property that Seller owns.

"**Parties**" has the meaning set forth in the preamble to this Agreement.

"**Party**" has the meaning set forth in the preamble to this Agreement.

"**Permitted Liens**" means the following: liens arising under original purchase price conditional sales contracts and equipment leases with third parties entered into in the ordinary course of business consistent with past practice which are not, individually or in the aggregate, material to the Business or the Purchased Assets

"**Person**" has the meaning set forth by section 101(41) of the Bankruptcy Code.

"**Petition Date**" has the meaning set forth in Recital A to this Agreement.

"**Purchased Assets**" has the meaning set forth in Section 1.1 of this Agreement.

"**Purchase Deposit**" has the meaning set forth in Section 1.4.1 of this Agreement.

"**Sale Motion**" has the meaning set forth in Section 5.8 of this Agreement.

"**Sale Order**" has the meaning set forth in Section 5.8 of this Agreement.

"**Sale Procedures Order**" means that Order (1) Approving Sale and Bidding Procedures in Connection with the Sale of Assets of Debtor's Estate; (2) Setting a Hearing on Sale Motion; and (3) Approving Form and Manner of Notice to be Provided to Creditors and Parties-In-Interest in Connection with Sale Motion, a copy of which, in materially final form, is attached as Exhibit E hereto.

"**Seller**" has the meaning set forth in the preamble to this Agreement.

"**Software**" means (a) software, firmware, middleware and computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code,

object code, executable code or binary code, (b) descriptions, flow-charts and other work product used to design, plan, organize, maintain, support or develop any of the foregoing, and (c) all documentation, including programmers' notes and source code annotations, user manuals and training materials relating to any of the foregoing, including any translations thereof.

"**Stay**" has the meaning set forth in Section 11.1.8 of this Agreement.

"**Tax**" means any federal, state, local, or foreign income, gross receipts, license; payroll, employment, excise, severance, escheatment, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, branch, franchise, profits, withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, goods and services, alternative or add on minimum, estimated, or other tax, levy, impost, deduction, charge, compulsory loan, withholding or duty of any kind whatsoever, including any interest, penalty, charge, fine or fee, or addition thereto, whether disputed or not, and any obligation to indemnify or otherwise assume or succeed to the tax liability of any other Person.

"**Transaction**" has the meaning set forth in Recital C to this Agreement.

"**Warranty Claims**" has the meaning set forth in Section 1.1.7 of this Agreement.

# EXHIBIT A

## ASSUMED CONTRACTS

### (Section 1.1.1)

[NONE]

---

## EXHIBIT B

### FURNITURE, FIXTURES AND EQUIPMENT

#### (Section 1.1.2)

[TO BE ADDED]

## EXHIBIT C
## ASSETS SCHEDULED FOR EXCLUSION
### (Section 1.2.11)

[NONE]

## EXHIBIT D

### SCHEDULED ASSUMED LIABILITIES
### (Section 2.3)

| Liability Assumed | Amount of Liability as of December 15, 2014 |
| --- | --- |
| Note Payable to Ryan Steelberg dated April 22, 2013 | $348,632.88 |
| Note Payable to Ryan Steelberg dated March 18, 2014 | 405,961.64 |
| Note Payable to Ryan Steelberg dated May 19, 2014 | 20,230.14 |
| Payable to Mydung Tran | 78,462.20 |
| Total | $853,286.86 |

47

MAINDOCS-#207396-v5-BrandAffinity-Asset_Purchase_Agreement.docx

## EXHIBIT E

**SALE PROCEDURES ORDER**

**(Section 5.7)**

[TO BE ADDED]

**EXHIBIT F**

**OWNED IP**

**(Section 7.8.1)**

[TO BE ADDED]

*[SELLER DISCLOSES THAT:*

*(1)    CBS INTERACTIVE, INC. ("CBS") HAS ASSERTED IN THE LIGHTBOURNE ACTION CLAIMS THAT SELLER HAS INFRINGED RIGHTS OF CBS, AND HAS MADE DEMANDS THAT SELLER INDEMNIFY CBS*

*(2)    SELLER HAS AGREED TO INDEMNIFY CERTAIN CUSTOMERS WITH RESPECT TO CLAIMS OF INFRINGEMENT IN CONNECTION WITH SERVICES PROVIDED BY SELLER TO SUCH CUSTOMERS.]*

## EXHIBIT G

## FORM OF BILL OF SALE

### (Section 9.2.2)

### [TO BE PROVIDED]

**EXHIBIT H**

**FORM OF ASSIGNMENT AGREEMENT**

(Section 9.2.2)

**[TO BE PROVIDED]**

Exhibit "3"

1

**EXHIBIT "3"**

2

**PROPOSED TIMELINE FOR SALE PROCESS**

3

4

| December 15, 2014 | Debtor filed Chapter 11 petition for relief |
| --- | --- |
| December 16, 2014 | Debtor filed and served Sale Procedures Motion |
| December 23, 2014 | [Proposed] hearing on Sale Procedures Motion |
| December 29, 2014 | Service of notice of Bid Deadline/Auction/Sale Motion Hearing |
| January 23, 2015 (Noon) | Bid Deadline |
| January 28, 2015 | Auction |
| February 2, 2015 | [Proposed] Sale Motion Hearing |
| February 17, 2015[1] | Deadline for Closing |

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[1] February 16, 2015, President's Day, is not a Business Day.

Exhibit "4"

## CHAPTER 11 BANKRUPTCY SALE

**Brand Affinity Technologies, Inc., Case No. 8:14-bk-17244 SC**

Items for Sale Include:  Intellectual Property Interests, including software systems and source code, issued patents and patents in application, trademarks, internet domain names; Stock Interests in Privately-Held Affiliated Company (a marketer and developer of cloud-based solutions for broadcasters and advertisers); Furniture, Fixtures and Equipment, including computer servers, data storage, networking equipment, mobile and desktop computers and photography equipment; Operations relating to the sale of personalized sports fan merchandise.

Bid Deadline:  **January 23, 2015**

Auction Date:  **January 28, 2015**

Sale Hearing Date:  **February ___, 2015**

For information regarding the assets to be sold, bid requirements, bidder qualifications and other matters regarding the Auction, please contact:

Brand Affinity Technologies's Counsel:
Robert E. Opera, Esq.
Winthrop Couchot Professional Corporation
660 Newport Center Drive, Suite 400
Newport Beach, CA 92660
Tel:  (949) 720-4130
E-Mail: ropera@winthropcouchot.com

Brand Affinity Technologies's Financial Advisor:
Patrick Lacy
GlassRatner Advisory & Capital Group, LLC.
19800 MacArthur Blvd., Suite 280
Irvine, CA 92612
Tel: (949) 429-4280
E-Mail: placy@glassratner.com

Exhibit "5"

ROBERT E. OPERA -- State Bar No. 101182
ropera@winthropcouchot.com
ANDREW LEVIN -- State Bar No. 290209
alevin@winthropcouchot.com
**WINTHROP COUCHOT**
**PROFESSIONAL CORPORATION**
660 Newport Center Drive, Fourth Floor
Newport Beach, CA 92660
Telephone:  (949) 720-4100
Facsimile:   (949) 720-4111

[Proposed] General Insolvency Counsel for
Debtor and Debtor-in-Possession

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - SANTA ANA DIVISION**

| | |
|---|---|
| In re:<br><br>BRAND AFFINITY TECHNOLOGIES, INC., a Delaware corporation,<br><br><br><br>        Debtor and<br>        Debtor-in-Possession. | Case No. 8:14-bk-17244 SC<br><br>Chapter 11 Proceeding<br><br>**NOTICE TO CREDITORS AND PARTIES-IN-INTEREST OF HEARING ON DEBTOR'S MOTION FOR ORDER AUTHORIZING (1) SALE OF ASSETS OF THE ESTATE FREE AND CLEAR OF LIENS AND INTERESTS; (2) ASSUMPTION AND ASSIGNMENT OF LEASES AND EXECUTORY CONTRACTS; AND (3) REJECTION OF LEASES AND EXECUTORY CONTRACTS**<br><br>DATE:     [Hearing To Be Scheduled]<br>TIME:     [Hearing To Be Scheduled]<br>PLACE:    Courtroom 5C<br>                Ronald Reagan Federal Building<br>                and United States Courthouse<br>                411 West 4th Street<br>                Santa Ana, CA 92701 |

**TO:  THE OFFICE OF THE UNITED STATES TRUSTEE; ALL KNOWN CREDITORS, INTEREST HOLDERS, AND PARTIES-IN-INTEREST:**

**PLEASE TAKE NOTICE** that, pursuant to an order entered by the Court, a hearing will be held on _____, 2015 at ___, in Courtroom ____ of the United States Bankruptcy Court, Santa Ana Division, to consider the Motion for Order Authorizing (1) Sale of Assets of the Debtor's Estate Free and Clear of Liens and Interests; (2) Assumption and Assignment of Leases and Executory Contracts; and (3) Rejection of Leases and Executory Contracts ("Sale Motion") filed by Brand Affinity Technologies, Inc., the debtor and debtor-in-possession in the above-captioned Chapter 11 case ("Debtor").[1]

The Debtor is experiencing severe financial difficulties.  The Debtors' operations are unprofitable, and the Debtor lacks cash sufficient for its operations.  The Debtor has severe concerns, therefore, regarding the viability of its business.

Given the concerns regarding the viability of the Debtor's business, the Debtor has determined that the best means for maximizing the value of the Debtor's assets is to attempt to sell, as expeditiously as possible, the Debtor's business as a going concern. Toward that end, the Debtor has negotiated with Creekside Investment Management, LLC ("Stalking Horse Bidder") the terms of an Asset Purchase Agreement ("Purchase Agreement") pursuant to which the Debtor has agreed to sell to the Stalking Horse Bidder, and the Stalking Horse Bidder has agreed to purchase from the Debtor, the Purchased Assets for a purchase price equal to the sum of the following: (i) $400,000 cash; (ii) the assumption of the Assumed Liabilities; and (iii) the payment of Sales Taxes and Cure Costs associated with the Transaction.  A copy of the Purchase Agreement, in substantially final form, is attached as Exhibit "2" to the Declaration of Mydung Tran filed in support of the Sale Motion [Docket No. ___].

The proposed sale of the Debtor's assets to the Stalking Horse Bidder is subject to open bidding at an Auction, with the Auction to be conducted out of court on **January 28, 2015**, to allow for a Closing of the Transaction by February 17, 2015.  The Debtor will seek, at the hearing on the Sale Motion, the Court's approval of the Successful Bid for the Purchased Assets.  The sale and bidding procedures approved by order of the Court are described in detail in that Sale Procedures Memorandum, which may be

---

[1] Unless otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the Sale Motion.

obtained by contacting the Debtor's proposed counsel, Winthrop Couchot Professional Corporation ("Winthrop Couchot"), or the Debtor's proposed financial advisors, GlassRatner Advisory & Capital Group, LLC ("GlassRatner"), as follows:

Robert E. Opera, Esq.                      Kerry Krisher
Winthrop Couchot Professional Corporation   GlassRatner Advisory & Capital Group, LLC
660 Newport Center Drive, Suite 400         19800 MacArthur Blvd., Suite 820
Newport Beach, CA 92660                     Irvine, CA 92612
Tel:  (949) 720-4130                        Tel: (949) 4729-4252
E-Mail: ropera@winthropcouchot.com          E-Mail: kkrisher@glassratner.com

Kerry Krisher of GlassRatner will be primarily responsible for supervising and managing on behalf of the Debtor all non-legal aspects of the proposed sale process in the Debtor's case, including the marketing of the Purchased Assets, the qualification of the bidders, the coordinating of the conducting of due diligence by bidders, the interaction with the bidders, and the conducting of the Auction.

Please note that any bids must be submitted to the Debtor by **January 23, 2015.**

**PLEASE TAKE FURTHER NOTICE** that, by the Sale Motion, the Debtor seeks an order of the Court granting to the Debtor the following relief:

1.      Authorizing the Debtor to sell and to assign to the Successful Bidder assets and properties associated with the operation of the Debtor's business in accordance with the provisions of the Successful Bid.

2.      Authorizing, with appropriate findings by the Court, the sale of the Debtor's assets and properties to the Successful Bidder free and clear of all claims (including, without limitation, tax claims, litigation claims, and successor liability claims), liens and interests, pursuant to 11 U.S.C. § 363(f), with any valid, duly-perfected and unavoidable liens to attach to the net sale proceeds of the assets and properties subject to such liens, in the pre-existing order of priority of such liens, to the extent of the allowed secured claims secured by such liens, as determined by 11 U.S.C. § 506.

3.      Authorizing, with appropriate findings by the Court, the Debtor to assume and assign to the Successful Bidder, pursuant to 11 U.S.C. §365, those unexpired leases and executory contracts designated by the Successful Bidder prior to the hearing on the Sale Motion ("Assumed Contracts").  In the event that a non-debtor party to any Assumed Contract has any objection to the proposed Cure Payment amount and/or to the assumption and assignment of the Assumed Contract, such party must file an objection to the Sale Motion based thereon.  Any failure by such party to file such an objection will constitute acceptance of such assignment and such Cure Payment amounts.

4.      Authorizing the Debtor to reject its interest in any unexpired lease or executory contract to be identified on a schedule to be filed by the Debtor prior to the hearing on the Sale Motion or subsequently thereafter via notice to such non-debtor contracting party, effective on the date that is one business day after the giving of the notice of such rejection.

5.      Approving, with appropriate findings of the Court, the adequacy of the notice given to creditors and parties-in-interest of the hearing on the Sale Motion.

6.      Issuing appropriate findings of the Court establishing: (i) the good faith of the Debtor and the Successful Bidder in connection with the negotiation, execution, delivery, and consummation of the sale of the Purchased Assets; and (ii) the arm's-length nature of such negotiations and transactions, together with such other findings as are necessary to ensure that the Successful Bidder is entitled to the protection afforded by 11 U.S.C. § 363(m), and that the transaction with the Successful Bidder is not subject to avoidance or other recovery under 11 U.S.C. §363(n).

7.      Waiving the fourteen (14) day stay, provided in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, of any order approving the Sale Motion.

**PLEASE TAKE FURTHER NOTICE** that any party interested in bidding on the Debtor's assets and properties must comply with the sale and bidding procedures set forth in the Sale Procedures Memorandum.

**PLEASE TAKE FURTHER NOTICE** that, if Qualified Bids are received by the Debtor, an Auction utilizing the sale and bidding procedures set forth in the Sale Procedures Motion will take place on **January 28, 2015, at 10:00 a.m.**, at the office of Debtor's counsel, Winthrop Couchot, located at 660 Newport Center Drive, Suite 400, Newport Beach, California 92660, or on such other date and at such other place as may be determined by the Debtor and noticed to Qualified Bidders.

**PLEASE TAKE FURTHER NOTICE** that any party interested in obtaining non-public information about the Debtor for the purpose of conducting due diligence for a possible bid should contact Kerry Krisher of GlassRatner, or Robert E. Opera, Esq. of Winthrop Couchot, both of whose contact information is set forth hereinabove.  Upon execution of an appropriate confidentiality agreement, the interested party will be provided with confidential information produced by the Debtor.

**PLEASE TAKE FURTHER NOTICE** that a copy of the Sale Procedures Order, a copy of the Sale Procedures Memorandum, and a Microsoft Word version of the Stalking Horse Bidder's Purchase Agreement and related exhibits may be obtained by contacting Robert E. Opera, Esq. of Winthrop Couchot or Kerry Krisher of GlassRatner.

In support of the Sale Motion, the Debtor respectfully represents as follows:

The Debtor is facing liquidity constraints and does not have the financial wherewithal to continue to operate its business throughout a prolonged Chapter 11 process. The Debtor has determined that the value of its estate will be preserved and maximized through a going concern sale of its business and the assets used therein. Accordingly, the Debtor has retained GlassRatner to assist the Debtor with the Debtor's efforts to market and sell the Debtor's assets, subject to a competitive sale and bidding process.

The Debtor believes that, unless a sale of the Debtor's assets is expeditiously consummated, there will be significant deterioration in the value of its assets. In fact, as reflected in the Debtor's Cash Flow Projection (Exhibit "1" to the Tran Declaration), the Debtor projects that, absent a cash infusion, its operations will continue to be unprofitable and that its cash resources will be insufficient to sustain its operations through the projected Closing of the Transaction, February 17, 2015. To address the Debtor's liquidity concerns, the Stalking Horse Bidder has agreed that, subject to the approval of the Court, the Stalking Horse Bidder will provide to the Debtor a secured loan in an amount not to exceed $75,000, as an advance against the Purchase Price, if such funds are necessary for the Debtor to be able to maintain its operations pending the Closing of the Transaction.

The Debtor has determined that the proposed Auction proceedings represent the most efficient and effective procedures for obtaining the highest and best sale price for the Purchased Assets. The sale of the Purchased Assets is subject to the sale and bidding procedures set forth in the Sale Procedures Motion, and, ultimately, to the Court's approval.

**IF YOU DO NOT OPPOSE THE SALE MOTION, YOU NEED TAKE NO FURTHER ACTION. HOWEVER, IF YOU OPPOSE THE SALE MOTION, OPPOSITION TO THE SALE MOTION, INCLUDING ANY OBJECTIONS TO THE PROPOSED ASSUMPTION AND ASSIGNMENT OF ASSUMED CONTRACTS (INCLUDING OBJECTIONS RELATING TO CURE PAYMENT AMOUNTS AND/OR TO THE PROVIDING OF ADEQUATE ASSURANCE OF FUTURE PERFORMANCE BY ANY BIDDER) MUST BE IN WRITING, MUST CONFORM TO THE REQUIREMENTS OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND THE LOCAL RULES OF THE BANKRUPTCY COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA, MUST SET FORTH THE NAME OF THE OBJECTING PARTY, THE BASIS FOR THE OBJECTION AND THE SPECIFIC GROUNDS THEREFOR, AND MUST BE FILED WITH THE COURT, LOCATED AT 411 WEST FOURTH STREET, SANTA ANA CA 92701-4593, AND SERVED ON THE FOLLOWING PARTIES SO AS TO BE ACTUALLY RECEIVED BY THE PARTIES BY NO LATER THAN _____, 2015:**

| Debtor's Counsel | Winthrop Couchot Professional Corporation, 660 Newport Center Drive, Suite 400, Newport Beach, CA 92660, Attn: Robert E. Opera, Esq. |
|---|---|
| Office of the United States Trustee | 411 West Fourth Street, Santa Ana CA 92701-4593, Attn: _____, Esq. |

**ANY FAILURE TO FILE AND SERVE TIMELY AN OPPOSITION TO THE SALE MOTION MAY RESULT IN ANY SUCH OPPOSITION BEING WAIVED AND THE COURT MAY ENTER AN ORDER GRANTING THE SALE MOTION WITHOUT FURTHER NOTICE.**

**UNLESS AN OBJECTION TO THE ASSIGNMENT OF AN ASSUMED CONTRACT IS FILED AND SERVED TIMELY AS SET FORTH ABOVE, THE NON-DEBTOR PARTY TO SUCH ASSUMED CONTRACT MAY (1) BE FOREVER BARRED FROM OBJECTING TO THE PROPOSED CURE PAYMENT AMOUNTS SET FORTH IN THE DEBTOR CONTRACTS SCHEDULE AND FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO EACH ASSUMED CONTRACT, AND THE DEBTOR AND THE SUCCESSFUL BIDDER WILL BE ENTITLED TO RELY UPON THE PROPOSED CURE PAYMENT AMOUNTS SET FORTH IN THE DEBTOR CONTRACTS SCHEDULE; (2) BE DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND ASSIGNMENT OF THE ASSUMED CONTRACT; AND (3) BE FOREVER BARRED AND ESTOPPED FROM ASSERTING OR CLAIMING AGAINST THE DEBTOR AND ANY SUCCESSFUL BIDDER (a) THAT ANY ADDITIONAL AMOUNTS ARE DUE OR OTHER DEFAULTS EXIST, (b) THAT ANY CONDITIONS TO ASSIGNMENT MUST BE SATISFIED UNDER SUCH ASSUMED CONTRACT, OR (c) THAT THERE IS ANY OBJECTION OR DEFENSE TO THE ASSUMPTION AND ASSIGNMENT OF SUCH ASSUMED CONTRACT.**

DATED: ____, 2014

WINTHROP COUCHOT

PROFESSIONAL CORPORATION

By:_____
          Robert E. Opera
          Andrew Levin
[Proposed] General Insolvency Counsel for Debtor
and Debtor-in-Possession

-3-

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  660 Newport Center Drive, 4th Floor, Newport Beach, CA 92660.

A true and correct copy of the foregoing document entitled:  **Declaration Of Mydung Tran In Support Of Debtor's Motion For Order:  (1) Approving Sale And Bidding Procedures In Connection With The Sale Of Assets Of The Debtor's Estate Free And Clear Of Liens And Interests; (2) Setting A Hearing On Sale Motion; And (3) Approving Form And Manner Of Notice To Be Provided To Creditors And Parties-In-Interest In Connection With Sale Motion** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On December 16, 2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on December 16, 2014, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Via Attorney Service**
Honorable Scott C. Clarkson
Ronald Reagan Federal Building
411 W. Fourth St.
Santa Ana, CA 92701

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| December 16, 2014 | Melody Conour | /s/ Melody Conour |
|---|---|---|
| Date | Printed Name | Signature |

NEF SERVICE LIST

- **Nancy S Goldenberg**    nancy.goldenberg@usdoj.gov
- **Robert E Opera**    ropera@winthropcouchot.com,
  pj@winthropcouchot.com;vcorbin@winthropcouchot.com;mconour@winthropcouchot.com
- **United States Trustee (SA)**    ustpregion16.sa.ecf@usdoj.gov